**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BROKER GENIUS INC.,

               *Plaintiff,*

      v.

NATHAN ZALTA,
MICHAEL SHAMAH, and
NRZ ENTERTAINMENT LLC

               *Defendants.*

Civil Action No. _____

**COMPLAINT**

---

Plaintiff Broker Genius Inc. ("Broker Genius" or "Plaintiff"), by and through its undersigned counsel, hereby brings this complaint against Defendants Nathan Zalta, Michael Shamah, NRZ Entertainment LLC as follows:

## INTRODUCTION

1.     This action is brought to remedy the unlawful conduct of Defendants in the misappropriation and retention of Broker Genius' confidential, proprietary and trade secret information, duplication of Broker Genius' copyrighted materials, and breach of their contractual obligations. By reason of Defendants' conduct they possess the proprietary and confidential underlying structure and functionality of Broker Genius' Auto Pricer Product and Service ("Auto Pricer"). To make matters worse, Defendants are making use of Broker Genius' confidential information to unfairly compete against Broker Genius, to tortuously interfere with Broker Genius' current and prospective business relations, and to unjustly enrich themselves.

2.     Now that Defendants' misconduct has been uncovered (although the full extent of their wrongdoing has yet to be discovered), Broker Genius seeks to hold Defendants accountable, stopping them from further exploiting Broker Genius' confidential information and putting an immediate halt to the substantial and irreparable harm and damages Defendants have caused, and continue to cause Broker Genius as a result of their unlawful activities.

## THE PARTIES

3.     Broker Genius is a Delaware corporation, with its principal place of business at 181 South Franklin, Suite 307, Valley Stream, New York, 11581.

4.     Defendant Nathan Zalta ("Zalta") is an individual having, upon information and belief, a residence at 1669 E. 10th Street, Brooklyn, New York, 11223-2321.

5.     Defendant Michael Shamah ("Shamah") is an individual having, upon information and belief, a residence at 914 Avenue N Brooklyn, NY 11230.

6.     Defendant NRZ Entertainment LLC ("NRZ") is a New York State limited liability company with its principal place of business at 1669 E. 10th Street, Brooklyn, New York, 11223-2321. Defendant Nathan Zalta is the owner and registered agent of NRZ Entertainment. Upon information and belief, NRZ is in the ticket brokering business and sells tickets on the secondary market, including via the www.nrztickets.com/sports.aspx website

7.     Upon information and belief, Defendant Shamah is and was the agent of Defendant NRZ and, at all relevant times, acted for his own benefit and for the benefit of, and with the knowledge and consent of Defendant NRZ.

8.      Upon information and belief, Defendant NRZ is and was the alter ego of Defendant Zalta, at all relevant times. Upon information and belief, Defendant Zalta is and was the moving, active, and conscious force behind Defendant NRZ's wrongful acts alleged herein.

9.      Upon information and belief, Defendants are and were at all relevant times the agents, affiliates, alter egos, partners, assignees, successors-in-interest, or principals of each other or were otherwise responsible for or participated in the performance of the wrongful acts alleged herein, and thereby are jointly and severally responsible for such acts and incurred liability therefore.

## JURISDICTION AND VENUE

10.      This Court has exclusive subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338 in that this case arises under various federal statutes, including 18 U.S.C. § 1836 *et seq.*, 17 U.S.C. § 101 *et seq.* The Court has supplemental jurisdiction over Plaintiff's remaining common-law claims under 28 U.S.C. § 1367.

11.      This Court has personal jurisdiction over Defendants because each of them resides and conducts business in New York and have jointly and severally committed acts of trade secret misappropriation, copyright infringement and other torts in the State of New York and in this district. In addition, some of the causes of action asserted by this Complaint arise out of Defendants' breaches of contract made in New York, to be performed in New York, governed by New York law, and in which Defendants have agreed to submit to the personal jurisdiction of this Court.

12.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events, acts, omissions, and injuries giving rise to the claims occurred in this judicial

district and because Defendants are subject to personal jurisdiction in this judicial district at the time this action has commenced. In addition, some of the causes of action asserted by this Complaint arise out of Defendants' breaches of contract made in New York, to be performed in New York, governed by New York law, and in which Defendants have agreed that any action at law or in equity arising under the contract would be filed only in the Supreme Court of the State of New York for the County of New York or the United States District Court for the Southern District of New York.

## BROKER GENIUS' BUSINESS

13.     Upon information and belief, Broker Genius is a technology company that develops pioneering products and services for the secondary ticket market and industry.

14.     Upon information and belief, over the course of more than three years, employment of more than 50 developers and computer programmers, multiple software version iterations, and the investment of over $4,000,000, Broker Genius developed its proprietary Auto Pricer Product and Service. In fact, Shmuel "Sam" Sherman, Broker Genius' founder and CEO, incurred substantial personal debt to develop the product and build the business.

15.     Upon information and belief, Auto Pricer is an automated pricing platform and solution that integrates with ticket resellers' various point-of-sale systems and allows them to set certain price rules on their ticket inventories and automatically adjust their pricing in accordance with market conditions.

16.     Upon information and belief, Broker Genius' technology has helped ticket resellers make 33-40% higher returns by lowering operational costs and increasing profits, and

has helped clients grow their inventory by up to eightfold, allowing them to scale-up rapidly and efficiently.

17.     Upon information and belief, Broker Genius has expended substantial resources over the years in developing its technology and in acquiring and building its relationships with clients based on several indispensable factors, including but not limited to Auto Pricer's proprietary underlying structure, design, efficiency, and customization.

18.     Upon information and belief, prior to Defendants' unlawful actions alleged herein, no other company provided an automated product or service that competes with Broker Genius' Auto Pricer.

## BROKER GENIUS' TRADE SECRETS AND CONFIDENTIAL INFORMATION

19.     Upon information, Broker Genius' trade secrets "Confidential Information" include, *inter alia*, the Auto Pricer source code and underlying structure and algorithms. Specifically, the entire Auto Pricer architecture, including functionalities, user interface and display and design, interworking of various components and modules, logic flows, databases, access methods, and supporting programs and systems are closely and confidentially maintained by Broker Genius as a trade secret.

20.     Upon information and belief, by way of example only, Broker Genius trade secrets Confidential Information include the functionalities and implementation of the Auto Pricer Events Panel, Listing Panel, Pricing Overview, Seasons Listing feature, Groups Listing feature, Group Season Listing feature, Rules and Profiles settings, and price filtering features.

21.    Upon information and belief, additional examples of Broker Genius' trade secrets Confidential Information include unique Auto Pricer pricing structures, terminology, layout and data presentation schemes, product usability knowledge such as when and how to properly use price floors, as well as when to price against specific splits within a defined set of criteria, and integration with various ticket brokers' point of sale systems.

22.    Upon information and belief, Broker Genius' trade secrets Confidential Information also include its video and personal client tutorial sessions and related documentation, during which clients are taught Auto Pricer best practices and non-intuitive and non-obvious methods of optimizing the numerous and unique Auto Pricer functionalities.

23.    Broker Genius' Confidential Information is collectively and individually a trade secret.

24.    Upon information and belief, Broker Genius is the sole owner of its trade secrets Confidential Information, which is of great value to Broker Genius and developed by expending significant capital and resources. Broker Genius' Confidential Information is a secret, as it is not known outside of Broker Genius' business nor is it in the public domain and Broker Genius has undertaken significant effort, time, expense, and other resources to develop and maintain its confidentiality.

25.    Upon information and belief, by way of example only, Broker Genius requires all of its employees to sign employment agreements and its employees are instructed to abide by Broker Genius' employee handbook that include confidentiality provisions broadly defining its proprietary and trade secrets  Confidential Information and including specific confidentiality, non-disclosure, and non-use obligations.

26.     Upon information and belief, Broker Genius also maintains its encrypted proprietary software computer code in private and protected repositories.

27.     Upon information and belief, Broker Genius uses independent consultants to continually audit and enhance its network security and the protection of its trade secrets Confidential Information.

28.     Upon information and belief, prior to demonstrating Auto Pricer on a trial basis subscription, Broker Genius requires prospective clients to agree to specific Terms of Use ("ToU") that restrict and prohibit unlawful uses of Broker Genius' products, services, website, applications, mobile platforms, tools, and modules (collectively and individually "Broker Genius Products and Services"). (*See* Exhibit 1.)

29.     Upon information and belief, prospective clients must agree to the ToU prior to creating a Broker Genius account.

30.     Among various restrictions, the ToU prohibit clients from "deriv[ing] data to determine Broker Genius functionality, user information, aggregate statistics on Broker Genius' performance, or the performance of third party data integration partners." In addition, prospective clients are granted a license to the Broker Genius Products and Services on certain specific conditions, including but not limited to an agreement not to "[m]odify, adapt, sub-license, translate, sell, reverse engineer, decompile or disassemble any portion of the [Broker Genius Products and Services] or otherwise attempt to derive any source code or underlying ideas or algorithms of any part of the [Broker Genius Products and Services]" and not to "[r]eproduce, modify, display, publicly perform, distribute or create derivative works of the [Broker Genius Products and Services]." Prospective clients also expressly acknowledge that

"[a]ny use of the [Broker Genius Products and Services] by you or anyone acting on your behalf that does not strictly comply with each and every provision in this section exceeds the scope of the license granted to you herein, constitutes unauthorized reproduction, display, or creation of unauthorized derivative versions of the [Broker Genius Products and Services] and infringes our copyrights and other rights in the [Broker Genius Products and Services]." (*See* Exhibit 1.)

31.     Upon information and belief, following a trial subscription, if a Broker Genius client decides to continue using the Broker Genius Products and Services, it enters into a Broker Genius Service Agreement. (*See* Exhibit 2.)

32.     Section 6.2 of the Service Agreement details certain "Prohibited Actions" including, but not limited to, any attempt to "reverse engineer, decompile, clone, copy or otherwise obtain a record or index of the source, object or compiled code of the Software." Section 1.2 of the Service Agreement broadly defines "Software" to include "the Broker Genius proprietary software in any form and related documentation delivered to or downloaded by you for use with the Services. The term 'Software' also includes any updates, upgrades or other new features, functionality or enhancements to the Software provided to you by Broker Genius or its agents or otherwise." In turn, "Services" is defined as "the Software platform, website, service, application or solution as set forth and provided in Appendix A." Notably, Section 6.4 of the Service Agreement includes an express "acknowledge[ment] [by the client] that the source code and underlying structure and algorithms of the Software are the property and proprietary trade secrets of Broker Genius or its licensors" and includes an express prohibition to "distribute, disseminate, sublicense, copy, modify, reverse engineer, decompile, translate, dissemble, or create a source code equivalent of or derivative of the Software or allow others to do so." (*See* Exhibit 2.)

33.     Upon information and belief, Broker Genius' trade secrets Confidential Information cannot be easily duplicated by others and provides Broker Genius with a competitive advantage over other companies that may seek to compete with it. This competitive advantage would be lost if such trade secrets Confidential Information became known to the public or to Broker Genius' competitors who otherwise would have to invest significant time and expense to develop such information independently.

## BROKER GENIUS' COPYRIGHTS

34.     Upon information and belief, Broker Genius is the owner of the original source code for the Auto Pricer Product and Service v.3 ("Auto Pricer v.3") including the Auto Pricer v.3 user interface and back-end functionality.

35.     The source code underlying the Auto Pricer v.3 user interface and back-end functionality has been registered with the U.S. Copyright Office under a certificate bearing the registration number TX0008308347.

## DEFENDANTS' MISCONDUCT

36.     Upon information and belief, in and around May, 2015, Defendants NRZ and Shamah were introduced to Broker Genius. On May 13, 2015, Broker Genius ran a demonstration of its Price Genius product and service (a related Broker Genius product and service employing many of the same proprietary and trade secret underlying structures, features and functionalities as Auto Pricer) to Defendants.

37.     Upon information and belief, subsequently, and over the next several months until December 28, 2015, Broker Genius extended Defendants access to its products and services on at

least two separate trial subscriptions. Prior to being granted such trial-basis access, Defendants agreed to Broker Genius' ToU. (*See* Exhibit 1.)

38.     The ToU constituted a contractual agreement between Defendants and Broker Genius in which, among other things, Defendants agreed not to reverse engineer, decompile or disassemble any portion of Broker Genius' products and services or otherwise attempt to derive any source code or underlying ideas or algorithms of any part of the Broker Genius products and services and not to reproduce, distribute or create derivative works of the Broker Genius products and services. (*See* Exhibit 1.)

39.     Upon information and belief, during these trial periods, Broker Genius assembled a team dedicated to training Defendants and explaining the Broker Genius products and services including proprietary and confidential best practices, functionalities, and features. The Broker Genius team consisted of its head of sales, an account manager, and an onboarding specialist.

40.     Upon information and belief, an onboarding specialist typically conducts limited preliminary training sessions for prospective clients. Broker Genius, however, conducted additional training for Defendants including on-site visits by its dedicated team.

41.     Upon information and belief, as an example, Zachary Ellman, Broker Genius' Vice President of Sales, discussed with Defendants how the Broker Genius technology automates pricing and cycle speeds, and how the product can be used to identify venue zones, sections, rows and splits to optimize pricing. Mr. Ellman also discussed with Defendants how often the Broker Genius product prices inventory and how to capture future sales. In addition, Mr. Ellman showed Defendants how Auto Pricer can be optimized to prevent a user from pricing

against themselves and how certain safeguards can be employed to avoid pricing against under-valued ticketing inventory.

42.     Upon information and belief, notably, while Defendants were testing Broker Genius' products and services, Broker Genius itself was continually implementing several improvements and enhancements to the products and services as its technology evolved and advanced. Thus, Defendants had confidential access to Broker Genius' products and services during the critical period when the products and services were undergoing essential iterations and improvements.

43.     Upon information and belief, on December 29, 2015, Defendants commenced a new 30-day trial subscription to test Auto Pricer. And again during this trial subscription, Broker Genius assembled a team dedicated to training and onboarding Defendants to Broker Genius' latest technology.

44.     Upon information and belief, as an example, on December 30, 2015, Mr. Ellman, visited Defendant Zalta's home in Brooklyn, New York, and provided on-site training. During this training, Mr. Ellman instructed Defendants on additional best practices for pricing ticket inventory, how to properly set season ticketing and group listing, and establishing pricing rules in an efficient manner.

45.     Upon information and belief, Defendants also learned about certain proprietary pricing update frequencies and manner by which Auto Pricer aggregates various data. Defendants also learned how to manipulate and appropriately apply Auto Pricer's Calculated Price ("CP") feature – a metric not used by any other ticket pricing analytics tool on the market.

Defendants also learned the import of various color coding employed by Auto Pricer to facilitate quick and efficient processing of pricing data.

46.     Upon information and belief, all of this personalized training was repeated by Broker Genius through remote sessions conducted specifically for Defendants.

47.     Upon information and belief, during this last trial subscription, Defendants expressed an interest to sign a one-year contract with Broker Genius for full access to Auto Pricer and, on February 4, 2016, Broker Genius sent its model Service Agreement to Defendants.

48.     On February 22, 2016, Defendant Shamah signed Broker Genius' Service Agreement on behalf of Defendant NRZ, which granted it a license and subscription to use Auto Pricer for one year. (*See* Exhibit 2.)

49.     Upon information and belief, The Service Agreement provided Defendants full access to Auto Pricer, including nearly unlimited access to online Help content and Broker Genius' support team for ongoing training.

50.     The Service Agreement constituted a contractual agreement between NRZ and Broker Genius in which, among other things, NRZ agreed not to reverse engineer or copy Broker Genius' proprietary software, product features and functionality, applications, solutions, source code, underlying structures and algorithms.

51.     Upon information and belief, during the course of Defendants' license and subscription to use Auto Pricer under the Service Agreement, Broker Genius continued to provide close and personalized support to Defendants.

52.     Upon information and belief, for example, on March 29, 2016, Broker Genius'
personnel explained to Defendants how to optimize its use of Auto Pricer by employing certain
best practices regarding ticket location mapping and flagging.

53.     Upon information and belief, during another exchange with Defendants, Broker
Genius explained how Auto Pricer critically integrates through ticket vendors' point-of-sale
systems and not directly on ticket exchanges.

54.     Upon information and belief, unbeknownst to Broker Genius, on August 22,
2016, while still using Auto Pricer Product under the terms of the Service Agreement,
Defendants registered a web domain under the name 'Tick Pricer.' *See* http://tickpricer.com/.

55.     Upon information and belief, after Defendants had already registered their soon
to-be launched unlawful Tickpricer website, they continued to request and Broker Genius
continued to provide Defendants critical and trade secrets Confidential Information about Auto
Pricer.

56.     Upon information and belief, specifically, and by way of example only, on
November 17, 2016, Defendants requested and received from Broker Genius information
regarding confidential optimal duration cycles for inventory updates.

57.     Upon information and belief, as another example, on November 18, 2016,
Defendants requested and received from Broker Genius confidential information regarding ticket
listing broadcasting in Ticket Utils ("TU") – a point-of-sale ("POS") system.

58.     Upon information and belief, on December 20, 2016, Defendant Shamah informed Broker Genius that NRZ intended to terminate its Auto Pricer license and subscription prior to conclusion of the one-year term.

59.     Upon information and belief, Broker Genius attempted to convince NRZ to continue with its Auto Pricer subscription. In fact, on December 29, 2016, Broker Genius conducted a personalized review session for Defendants, during which it showed Defendants how Auto Pricer had helped NRZ achieve higher returns and increased profits. Nevertheless, NRZ decided not to continue with its Auto Pricer subscription and Broker Genius did not contest NRZ's early termination request.

60.     Upon information and belief, on January 9, 2017, Defendants terminated their Auto Pricer license and subscription. On the same day, Defendants sent Broker Genius an email stating that "they deeply appreciate everything Zak [Ellman] has done for us."

61.     Upon information and belief, on March 2, 2017, Broker Genius discovered the Tickpricer.com website. Broker Genius immediately recognized that the user interface and ticket pricing and inventory management features and functionalities touted on the Tickpricer website were substantially similar and in some cases essentially identical to and derived from its Auto Pricer Product and Service.

62.     Upon information and belief, on March 10, 2017, Broker Genius received an email from a prospective client, representing approximately $1,000,000 in business, inquiring about competing products, including the Tickpricer.com website and product.

63.     Upon information and belief, on March 13, 2017, during a call with another prospective client, Broker Genius was asked about Defendants' Tickpricer product. Broker Genius was forced to offer a discount to sign the client.

64.     Upon information and belief, on March 14, 2017, Broker Genius received additional inquiries from prospective clients and trial-subscription clients inquiring about the Tickpricer website and product. Specifically, prospective clients inquired about differences between Auto Pricer and Tickpricer, and Broker Genius was asked whether it intended to lower its rates.

65.     Upon information and belief, recently, one of Broker Genius' trial-basis clients decided to cancel its trial subscription and stated that it had decided to sign with Tickpricer because Tickpricer had offered it a steep discount. And, another client on a trial subscription emailed Broker Genius with a link to the Tickpricer website inquiring about the Tickpricer product.

66.     Upon information and belief, on March 21, 2017, a long term Broker Genius client, representing significant revenue, cancelled its Auto Pricer subscription and informed Broker Genius that it was switching to the Tickpricer product.

67.     Upon information and belief, notably, one of Broker Genius' main investors, which had previously committed to make a large and critically important capital investment in the company, recently decided to reevaluate its commitment pending the outcome of this action and Broker Genius' ability to prevent Defendants from continuing to improperly exploit Broker Genius' trade secrets Confidential Information in the Tickpricer website and product.

68.     Upon information and belief, Defendants were planning to unfairly compete and interfere with Broker Genius' business and were developing the infringing and unlawful Tickpricer website and product since no later than August 2016, during the term of NRZ's Service Agreement and while Defendants were, in the guise of Broker Genius clients, requesting and receiving trade secrets Confidential Information from Broker Genius.

69.     Upon information and belief, the Tickpricer website was launched sometime in February, 2017.

70.     Upon information and belief, the Tickpricer domain is registered to Defendant Zalta. In addition, Defendant Zalta is the administrative contact for the Tickpricer web domain.

71.     Upon information and belief, Defendants own and operate the Tickpricer website and are the main beneficiaries of clients that use the Tickpricer product.

72.     Upon information and belief, using screenshots that are substantially similar to the proprietary Auto Pricer user interface, the Tickpricer website highlights the same features and functionality exclusively available with Auto Price and developed by Broker Genius for nearly four years and at the cost of millions of dollars. Moreover, the Tickpricer product employs functionality, layout, color coding, and work flows substantially similar, and in some cases nearly identical, to Auto Pricer's and Broker Genius' user interface.

73.     Upon information and belief, specifically, and by way of example only, the Tickpricer website touts a group sales listing feature that functions in the same way and achieves the same result as the Groups function in Auto Pricer. The Tickpricer website also depicts both

seasons and group seasons features that function in identical fashions to the Auto Pricer Seasons and Group Seasons functionalities respectively.

74.    Upon information and belief, as a further example, the Tickpricer product uses an events panel identical or nearly identical to the Auto Pricer Product that, among other things, employs identical or nearly identical data filters and displays the same inventory and market data information presented in the Events panel on Auto Pricer.

75.    Upon information and belief, Defendants have also disparaged Broker Genius through sales and marketing channels.  For example, one of Defendants' sales representatives recently falsely claimed to a ticket broker that the Tickpricer product is faster, cheaper and better than Auto Pricer, and that, unlike Broker Genius, they have mobile functionality. The sales representative also stated that the Tickpricer product was developed with Broker Genius "in mind."

76.    Upon information and belief, Defendants have also been suggesting to ticket brokers that Broker Genius sells its clients' personal data, which – a false and baseless accusation.

77.    Upon information and belief, Defendants, without authorization, reverse-engineered, decompiled and disassembled Broker Genius' Auto Pricer Product and user interface to derive Broker Genius' software code. Defendants also unlawfully copied and misappropriated Broker Genius' trade secrets Confidential Information including algorithms, product features and functionalities to design their infringing and unlawful Tickpricer product and user interface.

78.     Upon information and belief, no later than May, 2015, and continuing through the filing of this action, Defendants unlawfully reproduced and copied, caused to be reproduced and copied, used, and/or prepared derivative works of Broker Genius' copyrighted Auto Pricer v.3 software code to make the user interface of the Tickpricer product.

79.     Upon information and belief, Defendants, without authorization, have misappropriated Broker Genius' trade secrets Confidential Information and have infringed its copyrights. Defendants are responsible for the actions and omissions alleged herein and are the proximate cause of the injuries that Broker Genius has suffered.

80.     Upon information and belief, the actions and omissions alleged herein to have been undertaken by the Defendants were undertaken collectively and/or individually by each of the Defendants, were actions and omissions that each Defendant authorized, controlled, directed, or had the ability to authorize, control or direct, and/or were actions and omissions that Defendants collectively and/or individually assisted, participated in, or otherwise encouraged, and are actions and omissions for which each Defendant is liable. Each Defendant aided and abetted the actions of the Defendants set forth herein, in that each Defendant had partial or full knowledge of those actions and omissions, provided assistance and benefitted from those actions and omissions, in whole or in part. Each of the Defendants was the alter ego and/or the agent of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting as the alter ego and/or within the course and scope of such agency and with permission, consent, and under the control of other Defendants.

## FIRST CAUSE OF ACTION
## Trade Secret Misappropriation Under the Defend Trade Secrets Act
## (18 U.S.C. § 1836 *et seq.*)

81.     Broker Genius realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 80 above.

82.     Broker Genius owns and possesses certain confidential and trade secret documents and information as alleged above that relate to Broker Genius' business.

83.     Broker Genius' confidential and trade secret documents and information relate to products and services used, sold, shipped, and ordered in, or intended to be used, sold, shipped and/or ordered in interstate or foreign commerce.

84.     Broker Genius has taken reasonable measures to protect the secrecy of its confidential and trade secret documents and information, including the secrecy of the Broker Genius Confidential Information Defendants have misappropriated.

85.     Defendants have, by the improper and unlawful means alleged above, acquired Broker Genius' trade secrets Confidential Information.

86.     At the time that Broker Genius' trade secrets Confidential Information was disclosed to Defendants, Defendants knew or had reason to know that the trade secret was acquired through improper and unlawful means, under circumstances giving rise to a duty to maintain the secrecy of Broker Genius' trade secrets.

87.     As a direct and proximate result of Defendants' conduct, Broker Genius has suffered and continues to suffer the disruption of its business relationships and the loss of clients and potential clients, dilution of good will, injury to its reputation, misappropriation of its trade secrets, and devaluation of its trade secrets and business.

88.     Defendants' misappropriation of Broker Genius' confidential information and trade secrets has caused and will continue to cause Broker Genius substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its trade secrets and business. Defendants have been unjustly enriched by their misappropriation of Defendants' confidential information and trade secrets.

89.     Defendants' misappropriation of the Broker Genius trade secret Confidential Information was intentional, knowing, willful, malicious, fraudulent, and oppressive. Broker Genius is entitled to an award of exemplary damages and reasonable attorneys' fees.

90.     Because Broker Genius' remedy at law is inadequate, Broker Genius seeks – in addition to damages – a temporary, preliminary, and permanent injunctive relief to protect its trade secrets Confidential Information as well as Broker Genius' legitimate business interests. Broker Genius will continue to suffer irreparable harm absent injunctive relief.

## SECOND CAUSE OF ACTION
### Copyright Infringement
### 17 U.S.C. § 101 *et seq.*

91.     Broker Genius realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 80 above.

92.     Broker Genius' proprietary source code for Auto Pricer v.3 is a work of original creative expression fixed in software programming. Broker Genius is the rightful owner of this copyrighted material and is empowered to enforce the rights inherent in its copyrights. Broker Genius has registered its copyrighted source code for Auto Pricer v.3 with the United States Copyright Office under a certificate bearing the registration number TX0008308347.

93.     As alleged above, Defendants, without Broker Genius' authorization or consent, and in express violation of the limitations on the access to which Defendants had any right of access, have reproduced and copied, caused to be reproduced and copied, used, and/or prepared derivative works of Broker Genius' copyrighted technology. In particular, Defendants have copied and made unauthorized use of Broker Genius' copyrighted Auto Pricer v.3 software code to create the user interface of the Tickpricer product.

94.     Defendants' conduct, which began no later than May, 2015 and continues through the filing of this action, constitutes direct and intentional infringement of Broker Genius' exclusive rights under the Copyright Act to control the reproduction, publication, and use and display of Auto Pricer v.3 user interface and display.

95.     Defendants' conduct constitutes repeated infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.*

96.     As a direct and proximate result of Defendants' conduct, Broker Genius has suffered and continues to suffer the disruption of its business relationships and the loss of clients and potential clients, dilution of good will, injury to its reputation, infringement of its copyrights, and devaluation of its copyrights and business.

97.     Defendants' infringement has caused and will continue to cause Broker Genius substantial injury, including, but not limited to statutory damages, actual damages, lost profits, harm to its reputation, and the diminution in value of its copyrights and business. Defendants have been unjustly enriched by their infringement.

98.     Defendants' infringement was intentional, knowing, willful, malicious, fraudulent, and oppressive. Broker Genius is entitled to an award of exemplary damages and reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
### Breach of Contract

99.     Broker Genius realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 80 above.

100.     The Terms of Use (ToU) and Service Agreement are binding contracts between Broker Genius and Defendants.

101.     By their conduct as alleged above, Defendants have breached at least the Code of Conduct and Conditional License provisions of the ToU and at least paragraphs 6.2 and 6.4 of the Service Agreement. In particular, Defendants have breached their obligations, *inter alia*, to access Broker Genius' technology only for permitted purposes and to refrain from misusing, copying, reproducing, decompiling, reverse engineering, or creating derivative works of the underlying structure, ideas or algorithms of Broker Genius' trade secret and proprietary technology.

102.     Broker Genius has satisfied all conditions precedent to bringing this action.

103.     As a direct and proximate result of Defendants' conduct, Broker Genius has suffered and continues to suffer the disruption of its business relationships and the loss of clients and potential clients, dilution of good will, injury to its reputation, and devaluation of its business.

104.    Defendants' breach of contract has caused and will continue to cause Broker Genius substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its business. Defendants have been unjustly enriched by their actions.

105.    Defendants' breach of contract was intentional, knowing, willful, malicious, fraudulent, and oppressive. Broker Genius is entitled to an award of exemplary damages and reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION
### Common Law Misappropriation of Trade Secrets

106.    Broker Genius realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 80 above.

107.    The rights and interests of Broker Genius in its Confidential Information, described above, constitute trade secrets as defined by the common law of the State of New York.

108.    Broker Genius owns all of the rights, title and interest in and to the trade secrets that Defendants used and continue to use in operating the Tickpricer.com website and Tickpricer product.

109.    Because of Broker Genius' reliance on the confidentiality provisions in the Terms of Use (ToU) and Service Agreement with Defendants, Broker Genius provided Defendants with access to and knowledge of Broker Genius' trade secrets Confidential Information.

110.    Such trade secrets were and are primary assets of Broker Genius and have actual and potential independent economic value for Broker Genius. Broker Genius has carefully

23

guarded its trade secret information and has taken reasonable steps to maintain its secrecy. There has been no disclosure of the trade secrets Confidential Information by Broker Genius.

111.    Defendants had knowledge that Broker Genius regarded the trade secret information as trade secrets and of their legal obligation and duty, by virtue of the ToU and the Service Agreement, to preserve the confidentiality of Broker Genius' trade secrets Confidential Information and to limit their use.

112.    Upon information and belief, Defendants knowingly, willfully and maliciously violated the ToU and Service Agreement and breached Broker Genius' confidence by misappropriating Broker Genius' trade secrets in order to develop, manufacture, produce and market competing products and services, including the Tickpricer.com website and product.

113.    As a direct and proximate result of Defendants' conduct, Broker Genius has suffered and continues to suffer the disruption of its business relationships and the loss of clients and potential clients, dilution of good will, injury to its reputation, misappropriation of its trade secrets, and devaluation of its trade secrets and business.

114.    Defendants' misappropriation of Broker Genius' trade secrets Confidential Information has caused and will continue to cause Broker Genius substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its trade secrets and business. Defendants have been unjustly enriched by their misappropriation of Defendants' confidential information and trade secrets.

115.    Defendants' misappropriation of the Broker Genius trade secrets Confidential Information was intentional, knowing, willful, malicious, fraudulent, and oppressive. Broker Genius is entitled to an award of exemplary damages and reasonable attorneys' fees.

116.    Because Broker Genius' remedy at law is inadequate, Broker Genius seeks – in addition to damages – a temporary, preliminary, and permanent injunctive relief to protect its trade secrets Confidential Information as well as Broker Genius' legitimate business interests. Broker Genius will continue to suffer irreparable harm absent injunctive relief.

## FIFTH CAUSE OF ACTION
### Tortious Interference with Business Relationships Under New York Law

117.    Broker Genius realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 80 above.

118.    By the above-alleged acts, Defendants have interfered and continue to interfere with Broker Genius' existing and prospective business relationships with clients and prospective clients.

119.    Upon information and belief, Defendants with full knowledge of Broker Genius' business relationships, intentionally interfered and continue to interfere with those relationships by, *inter alia* operating the competing the Tickpricer.com website and offering the Tickpricer product, using Broker Genius' trade secrets Confidential Information to develop its products and services, infringing Broker Genius' copyrights, and by directly targeting and soliciting ticket brokers in the secondary ticket resale market.

120.    Upon information and belief, the unlawful and improper acts of Defendants, as alleged above, also prevented and continue to prevent third parties from entering into business relationships with Broker Genius.

121.    Upon information and belief, Defendants' conduct was motivated solely by malice and/or to inflict injury on Broker Genius by unlawful means.

122.    As a direct and proximate result of Defendants' conduct, Defendants have and continue to injure Broker Genius by denying business to and diverting business from Broker Genius, which Broker Genius would have otherwise had and from which it would have derived a profits.

123.    Upon information and belief, by their acts alleged above, Defendants have made and will make substantial profits and gains to which they are not in law or equity entitled.

124.    Defendants' tortious interference with Broker Genius' business relationships has caused and will continue to cause Broker Genius substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its business. Defendants have been unjustly enriched by their unlawful conduct.

125.    Defendants' tortious interference with Broker Genius' business relationships was intentional, knowing, willful, malicious, fraudulent, and oppressive. Broker Genius is entitled to an award of exemplary damages and reasonable attorneys' fees.

126.    Upon information and belief, Defendants intend to continue to interfere with Broker Genius' business existing and prospective business relationships unless restrained and enjoined by this Court.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment

127.    Broker Genius realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 80 above.

128.    By the unlawful conduct alleged above, Defendants have been unjustly enriched to the detriment of Broker Genius' business expectancies.

129.    Defendants have unlawfully taken and retained from Broker Genius the value of its trade secrets Confidential Information, copyrights, and existing and prospective business relationships without just compensation to Broker Genius.

130.    Upon information and belief, by the above-alleged acts, Defendants have made and will make substantial profits and gains to which they are not in law or equity entitled.

131.    As a direct and proximate result of Defendants' above-alleged acts, Broker Genius has suffered irreparable harm and damage and is suffering monetary damages in an amount to be determined at trial.

132.    The circumstances surrounding Defendants' acts are such that equity and good conscience require Defendants to make full restitution to Broker Genius for their unjust enrichment.

133.    Defendants' conduct, as-alleged above, was intentional, knowing, willful, malicious, fraudulent, and oppressive. Broker Genius is entitled to an award of exemplary damages and reasonable attorneys' fees.

## SEVENTH CAUSE OF ACTION
### Breach of the Implied Duty of Good Faith and Fair Dealing

134.    Broker Genius realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 80 above.

135.    The Terms of Use and Service Agreement between Broker Genius and Defendants impose an obligation of good faith and fair dealing on Defendants.

136.    Defendants owed Broker Genius a duty to deal fairly and in good faith, including but not limited to, a duty to refrain from reducing the goodwill of Broker Genius, to maintain the secrecy and refrain from misappropriating and unlawfully using and disclosing Broker Genius' trade secrets Confidential Information and infringing its copyrights, and to avoid from tortuously interfering with Broker Genius' business relationships.

137.    By the acts described above, Defendants breached these duties by, *inter alia*, misappropriating and unlawfully using and disclosing Broker Genius' trade secrets Confidential Information and infringing its copyrights to develop, market and sell competing products and services and to solicit existing and prospective clients away from Broker Genius.

138.    As a direct and proximate result of Defendants' breaches, Broker Genius was deprived of the benefits of the ToU and the Service Agreement.

139.    Defendants' conduct, as alleged-above, has caused and will continue to cause Broker Genius substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its business.

140.    Defendants' conduct, as-alleged above, was intentional, knowing, willful, malicious, fraudulent, and oppressive. Broker Genius is entitled to an award of exemplary damages and reasonable attorneys' fees.

141.    Upon information and belief, Defendants intend to continue their conduct unless restrained and enjoined by this Court.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable by right.

## DEMAND FOR RELIEF

Plaintiff requests that the Court find in its favor and against Defendants, and that the Court grant Plaintiff the following relief:

a.    Awarding damages as described in each of the above claims, in favor of Plaintiff and against Defendants in amounts to be determined at trial;

b.    Granting a temporary restraining order, and preliminary and permanent injunction against Defendants, enjoining them from violating their legal and contractual duties to Plaintiff, from accessing, using or disclosing Plaintiff's trade secrets and from any further infringement of Plaintiff's copyrights;

c.    Awarding punitive damages in favor of Plaintiff and against Defendants in an amount to be determined at trial;

d.    Awarding Plaintiff pre-judgment and post-judgment interest, and its attorneys' fees, costs and other expenses incurred in this action;

e.    Granting Plaintiff such other and further relief as the Court may deem just and proper under the circumstances.

RESPECTFULLY SUBMITTED,

March 22, 2017


 /s/  Daniel J. Melman
Daniel J. Melman (DM-8239)
Veronica Mullally Muñoz (MM-9985)
PEARL COHEN
    ZEDEK LATZER BARATZ LLP
1500 Broadway, 12th Floor
New York, NY 10036
(646) 878-0800
DMelman@PearlCohen.com
VMunoz@PearlCohen.com

*Attorneys for Plaintiff*
    *Broker Genius*

# EXHIBIT 1

**Terms of use | Broker Genius**

Notebook:     Unsorted
Created:     3/22/2017 2:25 PM
URL:          https://brokergenius.com/terms

# Terms Of Use

## Please Note: UPDATED EFFECTIVE: June 6, 2016

The following are the terms of use ("Terms") that govern your use of the Broker Genius Site, related websites, applications, mobile platforms, services, tools, modules, integrated application sites and remote services, servers, and services residing on servers owned and/or operated by third parties (collectively, the "Site, Services or Apps"). Our Privacy Policy, Purchase Policy, and any other policies, rules or guidelines that may be applicable to particular offers or features on the Site, Services or Apps are also incorporated into these Terms. By visiting or using the Site, Services or Apps or using Broker Genius Apps, you expressly agree to these Terms, as updated from time to time.

We are not responsible for the accuracy of any information displayed in our Apps, Services or Sites, for any or untimely, latent or missed transaction. We are not responsible for user account data and are not responsible or liable for accidental or intention data loss through the use of our Apps, Services or Sites.

We may make changes to these Terms at any time. Any changes we make will be effective immediately when we post a revised version of these Terms on the Site or Apps. The "Last Updated" date above will tell you when these Terms were last revised. By continuing to use this Site or Apps after that date, you agree to the changes.

The Site or Apps are not intended for children under the age of 13 and no person under the age of 13 may use the Site or Apps. We strongly encourage all parents and guardians to monitor the Internet use by their children. If you use the Site or Apps, you affirm you are at least 13 years old.

# Updates to Terms

We will notify you either through a direct communication, social medial channels or other mechanisms when our terms of use and policy provisions change.

## Account Registration

You will be required to register for an account to use certain features of the Site or Apps, such as but not limited to, integrating with point of sale systems, purchasing a tickets, and listing tickets on ticket exchange networks. Your account username may not include the name of another person with the intent to impersonate that person, or be offensive, vulgar or obscene. Your account username and password are personal to you. You will be responsible for the confidentiality and use

of your username and password, and for all activities (including commercial transactions) that are conducted through your account. You may not transfer or sell access to your account. We will not be liable for any harm related to disclosure of your username or password or the use by anyone else of your username or password. You may not use another user's account without that user's permission. You will immediately notify us in writing if you discover any unauthorized use of your account or other account-related security breach. We may require you to change your username and/or password if we believe your account is no longer secure or if we receive a complaint that your username violates someone else's rights. You will have no ownership in your account or your username. We may refuse registration, cancel an account or deny access to the Site or Apps for any reason.

## Third Party Access and Authorization

Broker Genius provides custom software solutions in order to optimize the ticket selling process. In order to provide the most up-to-date information to you, we ask for and you provide your password and user name to any ticket exchange account service that you wish to integrate with your Broker Genius service.

Furthermore, based on your use of the site, service and apps, Broker Genius may create and maintain, for your sole benefit, an access or developer key to a 3rd party API or developer program. By agreeing to the terms of use herein, you grant Broker Genius the right to obtain and implement a software strategy that includes creating a developer instance or account on your behalf for your sole benefit, based on 3rd party account information, and implementing or operating a software solution for your benefit. You further agree to be bound the restrictions of any and all 3rd party API or developer program terms of use agreements. Stubhub's API license agreement can be found here.

# Code of Conduct

## You agree that you will comply with all applicable laws, rules and regulations, and that you will not:

* Restrict or inhibit any other person from using the Site or Apps;
* Use the Site or Apps for any unlawful purpose;
* Express or imply that any statements you make are endorsed by us, without our prior written consent;
* Impersonate any person or entity, whether actual or fictitious, including any employee or representative of our company;
* Submit (a) any content or information that is unlawful, fraudulent, libelous, defamatory, or otherwise objectionable, or infringes our or any third party's intellectual property or other rights; (b) any non-public information about companies without authorization; or (c) any advertisements, solicitations, chain letters, pyramid schemes, surveys, contests, investment opportunities or other unsolicited commercial communication;
* Submit, or provide links to, any postings containing material that could be considered harmful, obscene, pornographic, sexually explicit, indecent, lewd, violent, abusive, profane, insulting, threatening, harassing, hateful or otherwise objectionable, includes the image or likeness of individuals under 18 years of age, encourages or otherwise depicts or glamorizes drug use (including alcohol and cigarettes), characterizes violence as acceptable, glamorous or desirable, or

contains any personal contact information or other personal information identifying any third party;
* Submit, or provide links to, any postings containing material that harasses, victimizes, degrades, or intimidates an individual or group of individuals on the basis of religion, race, ethnicity, sexual orientation, gender, age, or disability;
* Engage in spamming or flooding;
* Harvest or collect information about Site or Apps users;
* Use or derive data to determine Broker Genius functionality, user information, aggregate statistics on Broker Genius's performance, or the performance of third party data integration partners.
* Circumvent restrictions placed on the types and form of data available through Broker Genius or attempt to subvert or compromise Tinoxomy's ability to provide users with valid and accurate information.
* Change, use or manipulate data in any way that is misleading to any user, customer, end user, or recipient of information.
* Violate the terms of use for

# Ownership of Data, Content and Grant of Conditional License

The Site or Apps and all data, text, designs, pages, print screens, images, artwork, photographs, audio and video clips, and HTML code, source code, or software that resides or is viewable, submitted or otherwise discoverable on the Site or Apps (collectively, the "Content") is owned by us or our licensors. We own a copyright in the Site or Apps and Content. We may change the Content and features of the Site or Apps at any time.

We grant you a limited, conditional, no-cost, non-exclusive, non-transferable, non-sub-licensable license to view or use this Site or Apps and its Content as permitted by these Terms, as a condition precedent, you agree that you will not:

* Submit any software or other materials that contain any viruses, worms, Trojan horses, defects, date bombs, time bombs or other items of a destructive nature;
* Manipulate identifiers, including by forging headers, in order to disguise the origin of any actions conduct with or through the site or Apps;
* Link to any portion of the Site or Apps other than the URL assigned to the home page of our Site or a URL for user storage located within the Apps;
* "Frame" or "mirror" any part of the Site or Apps;
* Modify, adapt, sub-license, translate, sell, reverse engineer, decompile or disassemble any portion of the Site or Apps or otherwise attempt to derive any source code or underlying ideas or algorithms of any part of the Site or Apps;
* Remove any copyright, trademark or other proprietary rights notices contained on/in the Site or Apps;
* Use any robot, spider, offline reader, Site, Apps, search/retrieval application or other manual or automatic device, tool, or process to retrieve, index, data mine or in any way reproduce or circumvent the navigational structure or presentation of the Site or Apps or its contents, including with respect to any CAPTCHA displayed on the Site or Apps. Operators of public search engines may use spiders to copy materials from the Site for the sole purpose of and solely to the extent necessary for creating publicly available searchable indices of the materials, but not caches or archives of such materials. We may revoke this exception at any time;
* Take any action that imposes or may impose (in our sole discretion) an unreasonable or

disproportionately large load on our infrastructure;
* Access, reload or refresh transactional event or ticketing pages, or make any other request to transactional servers, more than once during any three-second interval;
* Reproduce, modify, display, publicly perform, distribute or create derivative works of the Site or Apps or the Content;

Use the Site or Apps or the Content in an attempt to, or in conjunction with, any device, program or service designed to circumvent any technological measure that effectively controls access to, or the rights in, the Site or Apps and/or Content in any way including, without limitation, by manual or automatic device or process, for any purpose.

This license is expressly conditioned on your preexisting agreement to comply with, and your actual compliance with, each of the provisions described in this Ownership of Content and Grant of Conditional License section. This license exists only so long as you strictly comply with each of the provisions described in this section. Any use of the Site, Apps or Content by you or anyone acting on your behalf that does not strictly comply with each and every provision in this section exceeds the scope of the license granted to you herein, constitutes unauthorized reproduction, display, or creation of unauthorized derivative versions of the Site, Apps and Content, and infringes our copyrights and other rights in the Site or Apps and Content. You will not acquire any ownership rights by using the Site or Apps or the Content.

The registered and unregistered trademarks, logos and service marks displayed on the Site or Apps are owned by us or our licensors. You may not use our trademarks, logos and service marks in any way without our prior written permission. You may inquire about obtaining permission by writing:

Broker Genius, Inc.
181 South Franklin Ave.
Valley Stream, NY 11581
support@brokergenius.com

# Transactions

You will pay all charges incurred by you or any users of your account and credit card (or other applicable payment mechanism) at the price(s) in effect when such charges are incurred, including any applicable taxes. You will pay any applicable taxes for any sale or transaction for which taxes may be withheld or otherwise be due to any government or body. You may only use credit or debit cards, gift cards or vouchers that belong to you or to people who expressly authorize you to use such payment methods. You may not attempt to conceal your identity by using multiple Internet Protocol addresses or email addresses to conduct transactions on the Site or Apps. You will not hold us liable if you do not comply with laws related to your transactions. We may provide law enforcement with information you provide to us related to your transactions to assist in any investigation or prosecution of you. If we are unable to verify or authenticate you provide during any registration, ordering, purchase, ticket posting, sale, authentication, delivery, payment or remittance process, or any other process, we may prohibit you from using the Site or Apps.

# User Content and Data

By agreeing to the terms of use herein, you grant Broker Genius the right to access, retrieve, and/or exchange information, including but not limited to historical, transactional, or usage or other

data from or with any point of sale systems, ticket network, or other 3rd party software platforms that you have authorized for integration with the Site or Apps ("User Data"). You own all rights to your User Data. You grant us a worldwide, non-exclusive, transferable, sublicenseable, royalty-free right and license to use, reproduce, modify, create derivative works of, distribute, publicly perform, display, archive and commercialize your User Data, in our sole discretion without any compensation or acknowledgment to you or anyone else. This license will not affect your ownership in your User Data, including the right to grant additional licenses to your User Data, except if it conflicts with these Terms. You will not make or authorize any claim against us that our use of your User Data infringes any of your rights.

We may host reviews, message boards, blog feeds, social media feeds and other forums found on the Site or Apps (collectively, "Forums"), and you may be able to submit suggestions, reviews, concepts, audio and video recordings, photographs, artwork or other materials to the Forums or other areas of the Site or Apps ("User Content").

By submitting User Content, you certify that you are at least 18 years old, or you are at least 13 years old and have obtained your parent's or legal guardian's express consent to submit User Content.

You own all rights to your User Content. If you submit User Content to the Site or Apps, you grant us a worldwide, non-exclusive, transferable, sublicenseable, royalty-free right and license to use, reproduce, modify, create derivative works of, distribute, publicly perform, display, archive and commercialize your User Content, in our sole discretion, in all formats and in all media channels now known or hereinafter discovered, without any compensation or acknowledgment to you or anyone else. This license will not affect your ownership in your User Content, including the right to grant additional licenses to your User Content, except if it conflicts with these Terms. We are not obligated to post, display or otherwise use any User Content, or to attribute your User Content to you. You will not make or authorize any claim against us that our use of your User Content infringes any of your rights.

Statements, opinions and reviews posted by participants in a Forum may be inaccurate, offensive, obscene, threatening or harassing. We do not endorse and are not responsible for these postings. We will not be liable for any loss or harm caused by the posting or your reliance on information obtained through the postings

You will be responsible for your User Content and the consequences of posting it. By submitting User Content, you represent to us that (i) you own, or have the necessary permission to submit the User Content and to grant the licenses to us under this section, and (ii) you have the written permission of every identifiable person in the User Content to use that person's name and likeness in the manner contemplated by the Site or Apps and these Terms or, if the person is a minor, the written permission of the minor's parent or legal guardian

We will have the right (but not the obligation) to monitor the Site or Apps, the Forums and the User Content, and to disclose any User Content and the circumstances surrounding its submission in order to operate the Site or Apps properly, or to protect ourselves, our sponsors and our users, or to comply with legal obligations or governmental requests.

If we are notified that your User Content does not comply with these Terms, we may investigate the allegation and may decide to remove your User Content and cancel your account.

# Claims of Copyright Infringement On The Site or Apps

Under the Digital Millennium Copyright Act of 1998 (the "DMCA") if you believe in good faith that any content on the Site or Apps infringes your copyright, you may send us a notice requesting that the content be removed. The notice must include: (a) your (or your agent's) physical or electronic signature; (b) identification of the copyrighted work on our Site or Apps that is claimed to have been infringed (or a representative list if multiple copyrighted works are included in one notification); (c) identification of the content that is claimed to be infringing or the subject of infringing activity, including information reasonably sufficient to allow us to locate the content on the Site or Apps; (d) your name, address, telephone number and email address (if available); (e) a statement that you have a good faith belief that use of the content in the manner complained of is not authorized by you or your agent or the law; and (f) a statement that the information in the notification is accurate and, under penalty of perjury, that you or your agent is authorized to act on behalf of the copyright owner. If you believe in good faith that a notice of copyright infringement has been wrongly filed against you, you may send us a counter-notice. You may read more information about the DMCA at http://www.loc.gov/copyright.

# Notices and counter-notices should be sent to:

Copyright Officer
Broker Genius, Inc
support@brokergenius.com

There can be penalties for false claims under the DMCA. We suggest that you consult your legal advisor before filing a notice or counter-notice.

## Links

The Site or Apps contains links and access to other Websites or Apps that may not be owned or operated by us. The fact that we may link to those website or Apps does not indicate any approval or endorsement of those websites or Apps. We have no control over those websites or Apps. We are not responsible for the content of those website or Apps, or the privacy practices of those website or Apps. We strongly encourage you to become familiar with the terms of use and practices of any linked website or Apps. Your use of other website or Apps is at your own risk and is subject to the terms of those website or Apps. It is up to you to take precautions to ensure that whatever links you select or software you download (whether from the Site or Apps or other Site or Apps) is free of viruses, worms, Trojan horses, defects, date bombs, time bombs and other items of a destructive nature.

## Parental Controls

We cannot prohibit minors from visiting our Site or Apps, and must rely on parents and guardians to decide what transactions to enter into. There are parental control protections (such as computer hardware, software or filtering services) available that may assist you in limiting access to material that is harmful to minors. You can find information about parental controls at http://onguardonline.gov and http://kids.getnetwise.org. We do not endorse the products or services listed at these website or Apps.

# Access from Outside the United States

The Site or Apps is directed to people residing in the United States. We do not represent that Content available on or through the Site or Apps is appropriate or available in other locations. We may limit the availability of the Site or Apps or any service or product described on the Site or Apps to any person or geographic area at any time. If you choose to access the Site or Apps from outside the United States, you do so at your own risk.

# Mobile Messaging

We may offer browsing and mobile messaging services which may include alerts. Mobile messaging may be provided by a 3rd party.

Message and data rates may apply, according to your rate plan provided by your wireless carrier. We will not be responsible for any text messaging or other wireless charges incurred by you or by a person who has access to your wireless device or telephone number. You may not receive our alerts if your carrier does not permit text alerts. Your carrier may not allow you to use pre-paid phones or calling plans to receive alerts. We may send you a bounce back message for every message you send to us. Service may not be compatible with all wireless carriers or devices. You may opt out of any alerts as specifically provided by any 3rd party provider.

We are not responsible for the accuracy of any information displayed in our mobile messaging, for any mis-delivery or untimely delivery of any mobile messaging, or your deletion or failure to store any mobile messaging from us.

# Mobile Device Application

If you install or use our mobile application, software and services, including any accompanying documentation (collectively, " Mobile App"), we grant you a limited right to install and use the App on a single authorized device located in the United States and its territories or in another country where we may offer the Mobile App. You may use the Mobile App for your personal, non-commercial and entertainment purposes only. You agree to also comply with any App Store Terms of Service. We do not grant you any rights to any related documentation, support, upgrades, maintenance or other enhancements to the Mobile App. We will not provide you with any device, internet access or wireless connection to use the Mobile App. We are not responsible for any interaction between you and another App user, or information you transmit through the App (including your location).

# Violation of these Terms

We may investigate any violation of these Terms, including unauthorized use of the Site or Apps. We may take legal action that we feel is appropriate. You agree that monetary damages may not provide us a sufficient remedy and that we may pursue injunctive or other relief for your violation of these Terms. If we determine that you have violated these Terms or the law, or for any other reason or for no reason, we may cancel your account, delete all your User Content and prevent you from accessing the Site or Apps at any time without notice to you. If that happens, you may no longer use the Site or Apps or any Content. You will still be bound by your obligations under these Terms. You agree that we will not be liable to you or any third party for termination of your access

to the Site or Apps or to your account or any related information, and we will not be required to make the Site or Apps or your account or any related information available to you. We may refuse to honor pending and future transactions made from all accounts we believe may be associated with you.

You agree that your abusive use of the Site or Apps may cause damage and harm to us, including impaired goodwill, lost sales and increased expenses. You also agree that monetary damages for your abusive use of the Site or Apps are difficult to determine and that you, and those acting with you, will be jointly and severally liable for liquidated damages.

# Disclaimer of Warranties

WE PROVIDE THE SITE OR APPS AND THE CONTENT TO YOU "AS IS" AND "AS AVAILABLE". WE TRY TO KEEP THE SITE OR APPS UP, BUG-FREE AND SAFE, BUT YOU USE IT AT YOUR OWN RISK. TO THE FULLEST EXTENT PERMISSIBLE BY LAW, WE DISCLAIM ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF TITLE, NON-INFRINGEMENT, ACCURACY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR WARRANTIES THAT MAY ARISE FROM COURSE OF DEALING OR COURSE OF PERFORMANCE OR USAGE OF TRADE. WE DO NOT GUARANTEE THAT THE SITE OR APPS WILL ALWAYS BE SAFE, SECURE OR ERROR-FREE OR THAT THE SITE OR APPS WILL ALWAYS FUNCTION WITHOUT DISRUPTIONS, DELAYS OR IMPERFECTIONS. WE ARE NOT RESPONSIBLE FOR THE ACTIONS OR INFORMATION OF THIRD PARTIES, AND YOU RELEASE US FROM ANY CLAIMS AND DAMAGES, KNOWN AND UNKNOWN, ARISING OUT OF OR IN ANY WAY CONNECTED WITH ANY CLAIM YOU HAVE AGAINST ANY SUCH THIRD PARTIES. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, SO SOME OF THESE EXCLUSIONS MAY NOT APPLY TO YOU. IF YOU ARE A CALIFORNIA RESIDENT, YOU WAIVE CALIFORNIA CIVIL CODE §1542, WHICH SAYS: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

# Limitation of Liability

IN NO EVENT WILL WE OR OUR SUPPLIERS, ADVERTISERS AND SPONSORS, BE RESPONSIBLE OR LIABLE TO YOU OR ANYONE ELSE FOR, AND YOU HEREBY KNOWINGLY AND EXPRESSLY WAIVE ALL RIGHTS TO SEEK, DIRECT, INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY TYPE OTHER THAN OUT OF POCKET EXPENSES, AND ANY RIGHTS TO HAVE DAMAGES MULTIPLIED OR OTHERWISE INCREASED, ARISING OUT OF OR IN CONNECTION WITH THE SITE OR APPS, THE USER CONTENT AND DATA, OR ANY PRODUCT OR SERVICE PURCHASED THROUGH THE SITE OR APPS, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND REGARDLESS OF WHETHER THE CLAIM IS BASED UPON ANY CONTRACT, TORT, OR OTHER LEGAL OR EQUITABLE THEORY. WITHOUT LIMITING THE FOREGOING, YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT WE WILL HAVE NO LIABILITY OR RESPONSIBILITY WHATSOEVER FOR:
(a) ANY FAILURE OF ANOTHER USER OF THE SITE OR APPS TO CONFORM TO THE CODES OF CONDUCT,
(b) PERSONAL INJURY OR PROPERTY DAMAGE, OF ANY NATURE WHATSOEVER, WHETHER ARISING IN CONTRACT OR IN TORT, RESULTING FROM YOUR ACCESS TO AND USE OF OUR SITE OR APPS,
(c) ANY UNAUTHORIZED ACCESS TO OR USE OF OUR SECURE SERVERS AND/OR ANY AND ALL

PERSONAL INFORMATION AND/OR FINANCIAL INFORMATION STORED THEREIN,
(d) ANY BUGS, VIRUSES, WORMS, TROJAN HORSES, DEFECTS, DATE BOMBS, TIME BOMBS OR
OTHER ITEMS OF A DESTRUCTIVE NATURE WHICH MAY BE TRANSMITTED TO OR THROUGH OUR
SITE OR APPS,
(e) ANY ERRORS, MISTAKES, INACCURACIES OR OMISSIONS IN ANY CONTENT, OR
(f) ANY LOST, STOLEN OR DAMAGED TICKETS or TRANSACTIONS, OR THE FAILURE OF A VENUE
TO HONOR A TICKET. YOUR SOLE AND EXCLUSIVE REMEDY FOR DISSATISFACTION WITH THE
SITE OR APPS IS TO STOP USING THE SITE OR APPS. THE LIMITATIONS IN THIS SECTION WILL
APPLY EVEN IF ANY LIMITED REMEDY FAILS OF ITS ESSENTIAL PURPOSE. THE ALLOCATION OF
RISK BETWEEN US IS AN ESSENTIAL ELEMENT OF THE BASIS OF THE BARGAIN BETWEEN US. OUR
AGGREGATE LIABILITY ARISING OUT OF THESE TERMS OR THE USE OF THE SITE OR APPS WILL
NOT EXCEED THE GREATER OF ONE HUNDRED DOLLARS ($100) OR THE AMOUNT YOU HAVE PAID
US IN THE PAST TWELVE MONTHS. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR
LIMITATION OF DAMAGES, SO THESE MAY NOT APPLY TO YOU. IN SUCH CASES, OUR LIABILITY
WILL BE LIMITED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW. IN NO EVENT WILL
ATTORNEYS' FEES BE AWARDED OR RECOVERABLE.

# Indemnification

If anyone brings a claim against us related to your use of the Site or Apps, your User Content or
your violation of these Terms, you agree to indemnify, defend and hold us and our affiliated
companies, event providers, suppliers, advertisers and sponsors, and each of our officers,
directors, employees, and agents, harmless from and against any and all claims, damages, losses
and expenses of any kind (including reasonable legal fees and costs). We reserve the right to take
exclusive control and defense of any claim, and you will cooperate fully with us in asserting any
available defenses.

# Disputes, Including Mandatory Arbitration and Class Action Waiver

Any dispute or claim relating in any way to your use of the Site or Apps, or to products or services
sold or distributed by us or through us, will be resolved by binding arbitration rather than in court,
with the following exceptions:

* You may assert claims in small claims court if your claims apply;
* If a claim involves the conditional license granted to you as described in the Ownership of
Content and Grant of Conditional License section above, either of us may file a lawsuit in a federal
or state court located within New York County, New York, and we both consent to the jurisdiction of
those courts for such purposes; and
* In the event that the arbitration agreement in these Terms is for any reason held to be
unenforceable, any litigation against us (except for small-claims court actions) may be commenced
only in a federal or state court located within New York County, New York, and we both consent to
the jurisdiction of those courts for such purposes.
* The arbitration agreement in these Terms is governed by the Federal Arbitration Act. It is
intended to be broadly interpreted, and will survive termination of these Terms. There is no judge
or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator
can award on an individual basis the same damages and relief as a court (including injunctive and
declaratory relief or statutory damages), and must follow these Terms as a court would.
* To begin an arbitration proceeding, you must send a letter requesting arbitration and describing

your claim. You may choose to have the arbitration conducted by telephone, based on written submissions, or in person in the county where you live or at another mutually agreed location.

* We each agree that the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding, and that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated or representative action. You agree to waive any right to a jury trial or to participate in a class action. If this specific provision is found to be unenforceable, then the entirety of this arbitration section will be null and void and neither of us will be entitled to arbitrate our dispute.

* You agree that these Terms evidence a transaction involving interstate commerce and will be governed by and construed in accordance with federal law to the fullest extent possible.

## No Reliance and Forward-Looking Statements

The information contained on the Site or Apps may not be current and should not be used or relied on for any investment decision regarding our securities or for any similar purpose. If necessary, we will file annual, quarterly and current reports, proxy statements and other information with the United States Securities and Exchange Commission ("SEC"). Copies of our filings are available at the Investor Relations section of this Site or Apps and also at the SEC's website or Apps at www.sec.gov.

Statements on the Site or Apps regarding our financial condition, results of operations and business and our expectations or beliefs concerning future events that are not historical facts are "Forward-Looking Statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Use of the words "believes," "expects," "anticipates," "plans," "estimates" or words of similar meaning is intended to identify Forward-Looking Statements but is not the exclusive means of identifying such statements. We caution you that there are some known and unknown factors that could cause actual results to differ materially from any future results, performance or achievements expressed or implied by such ForwardLooking Statements, including but not limited to economic, competitive, governmental and technological factors affecting our operations, markets, products, services and prices, as well as the risks and uncertainties set forth in the documents we file with the SEC, specifically the section titled "Item 1A. Risk Factors" of our most recent Annual Report on Form 10-K and Quarterly Reports on Form 10-Q and Current Reports on Form 8-K. We do not undertake any obligation to publicly update or revise any Forward-Looking Statements because of new information, future events or otherwise.

# Questions

## If you have any questions, comments or complaints regarding these Terms or the Site or Apps, please contact us at:

Broker Genius, Inc.
support@brokergenius.com

# EXHIBIT 2

# BROKER GENIUS SERVICE AGREEMENT

PLEASE READ THIS SERVICE AGREEMENT ("AGREEMENT") CAREFULLY BEFORE USING BROKER GENIUS, INC. ("BROKER GENIUS") SERVICES OR PRODUCTS (THE "SERVICES"). YOU, (or "Client") MEANING THE LEGAL ENTITY SIGNING UP FOR THE SERVICE, WILL BE BOUND BY THIS AGREEMENT IF YOU USE OR INSTALL THE SOFTWARE ENABLING THE SERVICE, BEGIN TO USE THE SERVICE, OR CHECK OR CLICK THE "I ACCEPT" OR SIMILAR BOX OR BUTTON AT THE BEGINNING OF PROCESS FOR USE OF THE SERVICE. IF YOU DO NOT AGREE WITH ALL THE TERMS OF THIS AGREEMENT DO NOT USE THE SERVICE.

1.  **Definitions.**

    1.1    "**Services**" means the Software platform, website, service, application or solution as set forth and provided in Appendix A.

    1.2    "**Software**" means the Broker Genius proprietary software in any form and related documentation delivered to or downloaded by you for use with the Services. The term "Software" also includes any updates, upgrades or other new features, functionality or enhancements to the Software provided to you by Broker Genius or its agents or otherwise. All references to the "purchase" or "sale" of Software mean the granting of a license to use such Software on the terms of this Agreement.

    1.3    "**Subscription**" means your right to use the Service during the Term, as set forth in Appendix A, for which you have paid the applicable fees.

    1.4    "**Term**" means the period of time during which your Subscription is in effect. The Term will commence on the day on which you activate the Service (which will require your agreement to the terms of this Agreement) and will extend for the period set forth in Appendix A, if no other period is specified, for one year from activation. The Term and this Agreement are subject to extension or to earlier termination as provided in this Agreement.

    1.5    "**You**" or "**Client**" means the legal entity signing up for the service or any employee of, contractor, agent, or any other individual or entity authorized by said legal entity.

2.  **General.**

    2.1.    **Scope of Agreement.** This Agreement will apply to the acquisition and use of all Services acquired by you, whether directly from Broker Genius or from an authorized reseller and whether by purchase or otherwise. For the avoidance of doubt, in the event of any conflict concerning the rights and obligations of the parties to this Service Agreement and any Terms or Use provided on any Broker Genius owned or operated website, application or Software, the terms of the Service Agreement shall govern.

  2.2. **Authority**. By accepting this Agreement, you agree that you are an authorized representative of the legal entity acquiring the Services with the authority to bind the legal entity to its terms.

  2.3. **Use Conditioned on Acceptance of This Agreement**. Your use of the Product is expressly limited to the terms and conditions of this Agreement.  This Agreement must be agreed to by you prior to your use of the Services and will be applicable whether or not it is attached to or enclosed with the Services.

3. **Intellectual Property**

  3.1 **PRODUCT LICENSE.**  BROKER GENIUS grants you a nonexclusive, nontransferable (except as provided in this Agreement) right to use the Software and Services solely in accordance with the related documentation, solely for Client's own internal business operations. The Software and Services are licensed, not sold, to you for use only under the terms of this Agreement.  BROKER GENIUS reserves all rights in the Software and Services not expressly granted to you under this Agreement and retains ownership of all Software and Services.  The Software and Services may be limited to a specific number of users or licensees, and you agree to abide by these limits and no circumvent any mechanism implemented to prevent additional or unauthorized use or access.

  3.2. **Ownership**. Broker Genius and/or its licensors own all right, title and interest, including intellectual property rights, in and to the Software and Services. You acknowledge that this Agreement and your use of the Software and Services do not transfer to you (a) any title to any Software or (b) any title to the intellectual property in systems used in the Software and Services or any rights therein other than the limited right to use the Software and Services under the terms of this Agreement. Any suggestions, ideas, enhancement requests, feedback, recommendations or other information that you provide to Broker Genius relating to any of its Software and Services or other websites, technologies, businesses or implementation are owned exclusively by Broker Genius. Broker Genius reserves all rights not expressly granted hereunder.

  3.3. **TRADEMARKS**.  Broker Genius uses certain trademarks and trade names in connection with the Service. You are not authorized to use any such trademarks for any purpose without prior written consent.

4. **TERMS OF SERVICE AND FEES**.

  4.1. **Subscription.** You will have the right to use the Software and Services subject to your compliance with the terms of this Agreement, including the payment of all applicable fees.

  4.2 **Fees**. You agree to the fees associated with accessing and using the Software and Services as provided in Schedule A.  You further agree that the fees provided in Schedule A are monthly

or yearly minimums, unless otherwise specified and that any additional fees will be in addition to those minimums.

     4.3.   **Quotes and Orders**. The pricing terms, services, product type, form of payment, timing of payment, the quantity and configuration of the Product(s) licensed, accessed or/and delivery terms for the Product(s) are contained in invoice, subscription service agreement, Quote, or billing statement (collectively " Payment statement") that is supplied or provided separately from this agreement, such as provided in Schedule A.  By installing, integrating, and or using the Software, you will be deemed to have accepted the terms of such an Agreement outlining those terms and hereby agree to be bound by them.

5.    **Your Responsibilities**.

     5.1.   **Settings**. You understand and agree that it is your sole responsibility to properly set up and maintain the settings for the sale and purchase of tickets or other items, including all parameters such as, but not limited to frequency, purchase price, duration of retention, sale price, limits, restoration settings, and update settings, as described in the applicable documentation for the Software and Services. Broker Genius will have no liability for any error in your selections of such settings that results in the improper, unprofitable or undesired exchanges.  You understand that BROKER GENIUS has relied on information provided by you regarding your computing environment in recommending the type of Software and Services best suited to support your needs. You agree that while BROKER GENIUS may recommend a particular Software and Services configuration, you are responsible for determining the Software and Services (s) that you need to meet your needs. You also understand and agree that to the extent the information provided to BROKER GENIUS is inaccurate or incomplete, your computing environment, or elements thereof, changes or you desire a higher level of performance, you may need to acquire additional Products or services from Broker Genius or a third party. In no event that shall Broker Genius have any liability for losses incurred using a computing environment that has been modified, changed or otherwise adapted from the environment, settings or parameters provided to Broker Genius.

     5.2.   **User Names and Passwords**. You agree that it is your sole responsibility to safeguard all usernames and passwords and other access credentials for your personnel who have access to the Services and to limit access to the Services to your authorized personnel. If you believe that the security of such access credentials has been compromised, you agree to notify Broker Genius and to cooperate in the resetting of any such access credentials. If Broker Genius determines that a security breach relating to your account has occurred or is likely to occur, Broker Genius may suspend your account until such breach has been remedied.

     5.3   **Processing of Personal Data.** Broker Genius LLC maintains a privacy policy found at www.brokergenius.com/privacy and incorporates entirely that policy by reference into this Agreement.

6.    **LIMITATIONS ON USE OF SERVICE**.

6.1.    **Use Only in General Business Applications.** You understand that the Service is provided for general business applications and you agree that you will not use the Service in other than general business applications pertaining to your business.

6.2.    **Prohibited Actions.** You agree that you will not (a) willfully tamper with the security of any of the systems used in the Service, tamper with other Broker Genius customer accounts or attempt to introduce any virus, worm or similar threat; (b) attempt to access data not belonging to or intended for you; (c) reverse engineer, decompile, clone, copy or otherwise obtain a record or index of the source, object or compiled code of the Software or (d) attempt to probe, scan or test the systems used in the Service or to breach any security or authentication measures.

6.3.    **No Right to Resell or to Provide Services.** You are expressly prohibited from reselling the Services to third parties, whether on a time-sharing, service provider or hosting basis.

6.4.    **No Right to Source Code.** You acknowledge that the source code and underlying structure and algorithms of the Software are the property and proprietary trade secrets of BROKER GENIUS or its licensors. Except as might be provided for open source licenses: (a) no license is granted to use BROKER GENIUS source code and all such use is expressly prohibited; and (b) you may not distribute, disseminate, sublicense, copy, modify, reverse engineer, decompile, translate, dissemble or create a source code equivalent of or derivative of the Software or allow others to do so.

6.5     **Use of Coded Instructions.** You acknowledge and agree that the Software may contain coded instructions which will (a) enable the Software to operate only on certain equipment or permit only specified features to operate, (b) limit the number of users for which the Software will operate, (c) confirm payment of the applicable license fee, (d) disable some or all of the features of the Software and any related electronic documentation upon the termination of your license, (e) contain such other permissions or restrictions as may be specifically included in this Agreement or in any other binding agreement between us; and (f) contain coded instructions regarding the level of support services to which you may be entitled with respect to the Software.

6.4.    **Proprietary Rights Notices.** You may not remove, alter or cover any copyright notices, trademark notices or other proprietary rights notices placed or embedded on or in the Products or cause or permit any third party to do any of the foregoing

7.      **TERM AND TERMINATION** The Term of this agreement is provided in attached Schedule A. The license granted to you for the Software will continue for the Term unless terminated earlier by Broker Genius upon your failure to comply with any term of this Agreement or the attached Schedule A, including payment.  Termination of the license under this Agreement for any reason will not relieve you of your obligation to pay fees accrued prior to the effective date of termination, nor will it entitle you to a refund, return or rebate of the fees that were paid prior to the effective date of termination.  Broker Genius's rights and your obligations will survive any termination of your license for any reason.

8.      **Disclaimer.**  BROKER GENIUS MAKES NO WARRANTIES OTHER THAN AS EXPRESSLY PROVIDED HEREIN AND EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT

{10153/808000-000/01229482.1}

NOT LIMITED TO, ANY IMPLIED WARRANTIES OF NON INFRINGEMENT, TITLE, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE TO THE EXTENT PERMITTED BY APPLICABLE LAW. IN PARTICULAR, BROKER GENIUS, ITS RESELLERS, PARTNERS AND THEIR RESPECTIVE AFFILIATES MAKE NO WARRANTY THAT (A) THE SOFTWARE OR SERVICES WILL MEET YOUR REQUIREMENTS; (B) YOUR USE OF THE SOFTWARE OR SERVICES  WILL BE TIMELY, UNINTERRUPTED OR ERROR-FREE; OR (C) ANY DEFECTS OR ERRORS IN THE SOFTWARE OR SERVICES WILL BE CORRECTED.

9.      LIMITED WARRANTY/DISCLAIMER OF WARRANTY.

9.1      **Software or Services**.  BROKER GENIUS warrants to the original purchaser, lessee or licensee of the Software that the same shall be free and clear of all liens and encumbrances, and Client shall be entitled to use the Software without disturbance. BROKER GENIUS further warrants that the Software will perform substantially as described in any official documentation provided by BROKER GENIUS when used in strict accordance with such documentation provided to you.  BROKER GENIUS will, at its sole option, correct any errors or provide work-arounds within a commercially reasonable time after receipt of notice or any failure to perform as described in the official documentation specification. Not withstanding the foregoing, BROKER GENIUS provides no warranty or assurance that the Software will perform substantially as described in any official documentation provided in the event that Client makes any changes, replacements or modifications to any software, or any module, implementation or installation thereof or any hardware that interfaces with the Software without the express written acknowledgement of BROKER GENIUS.

9.2      **Disclaimer**.  BROKER GENIUS MAKES NO WARRANTIES OTHER THAN AS EXPRESSLY PROVIDED HEREIN AND EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF NON-INFRINGEMENT, TITLE, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE TO THE EXTENT PERMITTED BY APPLICABLE LAW. IN PARTICULAR, BROKER GENIUS MAKES NO WARRANTY THAT (A) THE SOFTWARE OR SERVICES WILL MEET YOUR REQUIREMENTS; (B) YOUR USE OF THE SOFTWARE OR SERVICES WILL BE TIMELY, UNINTERRUPTED OR ERROR-FREE; OR (C) ANY DEFECTS OR ERRORS IN THE SOFTWARE OR SERVICES WILL BE CORRECTED.

10.      **LIMITATION OF LIABILITY.**  TO THE EXTENT NOT PROHIBITED BY LAW, IN NO EVENT WILL BROKER GENIUS, ITS RESELLERS, PARTNERS AND THEIR RESPECTIVE AFFILIATES BE LIABLE FOR PERSONAL INJURY OR ANY INCIDENTAL, SPECIAL, INDIRECT, OR CONSEQUENTIAL DAMAGES WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, LOSS OF DATA, BUSINESS INTERRUPTION, PROCUREMENT OF SUBSTITUTE GOOD OR SERVICES OR ANY OTHER COMMERCIAL DAMAGES OR LOSSES, ARISING OUT OF OR RELATED TO YOUR ABILITY TO USE OR INABILITY TO USE THE SERVICE HOWEVER CAUSED, REGARDLESS OF THE THEORY OF LIABILITY AND EVEN IF BROKER GENIUS HAS BEEN ADVISED OF THE POSSIBILITY OF DAMAGES. IN NO CASE WILL BROKER GENIUS'S TOTAL LIABILITY TO YOU FOR DAMAGES HEREUNDER EXCEED THE AMOUNT PAID BY YOU FOR SERVICES DURING THE THREE MONTHS PRIOR TO SUCH CLAIM. YOU SPECIFICALLY AGREE

THAT THE ALLOCATION OF RISK BY MEANS OF THIS DAMAGES LIMITATION IS A FUNDAMENTAL ELEMENT OF THE BASIS OF THE BARGAIN BETWEEN YOU AND BROKER GENIUS AND THAT THE PRICING OF THE SERVICE TAKES THIS LIMITATION INTO ACCOUNT. NOT WITHSTANDING THE FOREGOING, BROKER GENIUS SHALL HAVE NO LIABILITY TO YOU IN THE EVENT THAT YOU MAKE ANY CHANGES, REPLACEMENTS OR MODIFICATIONS TO ANY SOFTWARE, OR ANY MODULE, IMPLEMENTATION OR INSTALLATION THEREOF OR ANY HARDWARE THAT INTERFACES WITH THE SOFTWARE WITHOUT THE EXPRESS WRITTEN ACKNOWLEDGEMENT OF BROKER GENIUS.

11.     **GOVERNING LAW.**  This Agreement will be governed and construed by the laws of the State of New York, excluding its conflict of law rules. You expressly agree that any action at law or in equity arising under this Agreement will be filed only in the Supreme Court of the State of New York for the County of New York or the United States District Court for the Southern District of New York and you hereby consent and submit to the personal jurisdiction of such courts for the purposes of litigating any such action.  The parties hereby expressly disclaim application of the U.N. Convention for the International Sale of Goods.

12.     **ENTIRE AGREEMENT.**  This Agreement is the entire agreement between you and Broker Genius regarding the subject matter hereof and supersedes any other communications with respect to the Services, and there are no promises, terms, conditions or obligations, oral or written, express or implied, between you and Broker Genius relating to the subject matter hereof other than those contained herein.

13.     **SEVERABILITY; WAIVER.**  If any provision of this Agreement is held invalid or unenforceable, the remainder of this Agreement will continue in full force and effect. Failure by a party to insist upon performance by the other party of any of its obligations under this Agreement will not constitute a waiver of the right to enforce its rights with respect to the same or any other provision.

14.     **ASSIGNMENT**.  Except pursuant to a merger, acquisition or business combination, neither party may assign this Agreement, by operation of law nor otherwise, without the prior written consent of the other party, which will not be unreasonably withheld.  Any prohibited assignment or sublicense or transfer will be null and void.  This Agreement will be binding upon the successors and assigns of both parties.

15.     **ATTORNEYS' FEES.**  In the event legal action is required to enforce or interpret any terms and conditions of this Agreement, the prevailing party in such legal action will recover all reasonable costs and expenses, including attorneys' fees, incurred in connection with such action.

16.     **FORCE MAJEURE**.  The performance by you or Broker Genius of any your or its obligations hereunder (other than the payment of money) will be excused during any period of time in which the failure to perform results from acts of God, the elements, fire, flood, component shortages, force

majeure, riot, insurrection, industrial dispute, accident, war, embargoes, legal restrictions or any other cause beyond the reasonable control of a party.

| Customer: NRZ | Broker Genius: |
|---|---|
| Name: Michael Shamah | Name: Sam Sherman |
| Address: 1669 east 10th st. Brooklyn, NY 11223 | Address: 181 S Franklin Ave, Valley Stream, NY 11581 |
| Contact: 917 566 9805 | Contact: 718 865 9335 |
| *Michael Shamah*      2/22/2016 | |

# SCHEDULE A

SERVICES ORDER FORM AND QUOTE

Customer: NRZ Entertainment LLC

Address: 1669 east 10th St. Brooklyn, NY 11223

Contact: Michael Shamah

Customer agrees to the attached Broker Genius Service Agreement to the following terms of the SERVICE:

Service Type:  Autopricer

Term:  1 Year starting on February 3rd, 2016

Payment Terms: Monthly

Pricing :  Customer agrees to pay a monthly minimum fee for the Service starting at $2,000.00/Month. Customer acknowledges that additional use of the same or additional Services (Add –Ons) will incur additional costs.

Add-Ons: Customer agrees to pay the following % of gross sales sold using Broker Genius pricing technology.  If the % of sales does not meet the $2,000 monthly minimum, the minimum will be charged;

| Sales Volume ($) | % of Sales Charge |
|---|---|
|  |  |
| 0-2.5 MM | 1.25% |
| 2.5-5 MM | 1.125% |
| 5 MM + | 1% |