UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

BROKER GENIUS, INC.

                              Plaintiff,

          -against-                                    17-cv-2099 (SHS)

NATHAN ZALTA, MICHAEL SHAMAH,              <u>OPINION & ORDER</u>
NRZ ENTERTAINMENT LLC,
JOSEPH BASSIL, and GONTHAM, LLC

                              Defendants.

------------------------------------------------------------

SIDNEY H. STEIN, U.S. District Judge.

     Broker Genius, Inc., a company that develops software for the ticket
broker industry, has sued its former licensees – defendants Nathan Zalta and
Michael Shamah, and their company, NRZ Entertainment LLC – alleging that
they used their access to Broker Genius's AutoPricer v.3 software improperly
to acquire the knowledge and information they needed to build a copycat
competitor product called TickPricer.  Broker Genius alleges that, in doing so,
defendants misappropriated Broker Genius's trade secrets, engaged in
copyright infringement, breached their contractual obligations and the
implied duty of good faith and fair dealing, unjustly enriched themselves,
and tortiously interfered with Broker Genius's current and prospective
business relations.  (*See* Compl., ECF No. 1.)  Plaintiff later joined two
additional defendants – software developer Joseph Bassil and his company,
Gontham, LLC – and alleges that they are also liable for trade secret
misappropriation, copyright infringement, and unjust enrichment for their
roles in helping Zalta, Shamah, and NRZ build TickPricer.  (Am. Compl., ECF
No. 25.)

     Broker Genius has now moved pursuant to Fed. R. Civ. P. 65 to
preliminarily enjoin the original defendants – Zalta, Shamah, and NRZ –
from using TickPricer or making it available to any third party.  (*See* Order to
Show Cause, ECF No. 5; Pl.'s Pre-Hearing Mem. 1.)  Broker Genius seeks this
relief only in connection with its claims of trade secret misappropriation

pursuant to New York law and the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, *et seq.* (Pl.'s Pre-Hearing Mem. 17 n.25.)

Because Broker Genius discloses the information that it alleges to be its trade secrets to each of its licensees as a matter of course and because it has not shown that it required those licensees to maintain the confidentiality of user-facing elements of the AutoPricer v.3 software, plaintiff has established neither a likelihood of success on the merits nor sufficiently serious questions going to the merits of its trade secret misappropriation claims. Accordingly, plaintiff's motion for a preliminary injunction is denied.

## I. PROCEDURAL BACKGROUND

At the same time that Broker Genius filed its complaint on March 23, 2017, it requested that the Court issue an *ex parte* temporary restraining order to, *inter alia*, seize any property of defendants NRZ, Zalta, and Shamah containing Broker Genius's trade secrets and to restrain them from marketing their TickPricer software product. The Court denied plaintiff's request for *ex parte* relief, held a hearing later that same day with counsel for all sides present, and granted a TRO directing defendants not to access or disclose Broker Genius's proprietary technology or information, not to violate any confidentiality obligations owed to Broker Genius, and not to destroy evidence, but the Court denied Broker Genius's requests to seize defendants' computers and prevent defendants from marketing the TickPricer product. (*See* Order to Show Cause, ECF No. 5.)

A hearing on Broker Genius's motion for a preliminary injunction was held over the course of three days in June where witnesses were heard and documentary evidence presented. The following constitutes this Court's findings of fact and conclusions of law.

## II. FACTUAL BACKGROUND

### A. Broker Genius's Lengthy and Expensive Development of AutoPricer

Broker Genius, Inc., is a software company that specializes in developing software products and services to help automate the pricing of tickets in

secondary markets.  The secondary market for tickets for sporting events, concerts, and theater performances is a multi-billion dollar industry in which ticket brokers purchase tickets from ticket sellers (*e.g.*, Ticketmaster) in the primary market and then resell to consumers through online exchanges (*e.g.*, StubHub).  (Prelim. Inj. Hr'g Tr. ("Tr.") 223:23-24; *see also* U.S. Patent Application Publication No. US 2015/0025918 A1, DX-1 ¶¶ 3-9.)

Broker Genius was founded in 2013 by Shmuel ("Sam") Sherman, who had previously worked as a ticket broker on the secondary market and currently serves as the company's CEO.  (Tr. 181:1-13.)  Sherman testified that he started Broker Genius in order to build a software product that would allow brokers to "implement the strategies" they had already been using to price tickets manually, but "within a user interface in which the user could engage . . . with the software dynamically and have the ability to change [his or her] strategy very quickly."  (Tr. 182:10-15.)  Sherman recognized that brokers did not only need an automatic pricing solution, but that they also needed a user interface that would enable them to efficiently "analyze the market" in order to define and price their inventory against comparable listings.  (Tr. 182:15-22, 185:11-16.)  At the time of Broker Genius's founding in 2013, no other software offered these capabilities.  (Tr. 182:8-22, 185:11-16.)

Sherman and plaintiff's expert, Dr. Eric Koskinen, testified that because Broker Genius was creating a type of product that did not already exist in the marketplace, it spent considerable time creating its own roadmap for the functions the software should perform and refining its user interface through trial and error and responses to customer feedback.  (Tr. 112:11-24, 114:3-18, 189:19-190:8.)  Accordingly, Broker Genius created multiple iterations of its product over the course of two years; it released the first version in September 2013 and did not launch the version at issue in this case – AutoPricer v.3 – until July 2015.  (Koskinen Expert Report, PX-62 § 5.2.1; *see also* Deposition of Sam Sherman, May 19, 2017, Pl.'s Pre-Hearing Mem., PX-84; Tr. 66:9-14.)  This development process necessitated an investment of over $4 million.  (Tr. 199:3-5.)

During the early stages of Broker Genius's development of its automatic pricing technology, it decided to protect its invention by filing a patent application with the U.S. Patent Office.  Broker Genius's patent application

was published on January 22, 2015 as Pub. No. US 2015/0025918 A1 (the "'918 Patent Application"). The '918 Patent Application describes a comprehensive system to automate the entire "ticket management process" – from forecasting market trends and purchasing event tickets to pricing the tickets for sale through various marketplaces. ('918 Patent Application, DX-1 ¶ 22.) A major portion of the system described in the application has a functionality which enables brokers to "manage all of their electronic tickets from one interface," automatically change the prices of tickets based on "predetermined user inputs," and "upload[ ] [their] ticket listings seamlessly to multiple secondary ticket exchange servers and integrat[e] with them in real time." (DX-1 ¶¶ 22, 33.) This is the same functionality that is found in AutoPricer v.3 – the software at issue in this case.

### B. Broker Genius's Alleged Trade Secrets

AutoPricer v.3 is a dynamic automatic pricing software that allows ticket brokers to manage their ticket inventories by setting pricing rules that enable the prices of their tickets to automatically adjust to reflect changes in the market. To accomplish this, AutoPricer v.3 integrates with point of sale ("POS") ticket inventory systems used by the brokers (*e.g.*, SkyBox), as well as the ticket exchanges in which tickets are sold to consumers (*e.g.*, StubHub).

In Dr. Koskinen's expert report, he identified fourteen "software components" that Broker Genius claims are the trade secrets that defendants misappropriated to create TickPricer. (Koskinen Expert Report, PX-62; *see also* Pl.'s Identification of Asserted Trade Secrets, June 5, 2017; Tr. 97:13-98:2.) These claimed trade secrets are generally comprised of: (1) AutoPricer v.3's application architecture (*see* SC001, SC014), (2) its overall user experience and user interface ("UX/UI"), including certain inter-operating and interactive software components (*see* SC003-SC0012), and (3) its techniques for improving the speed of pricing calculations and making the software scalable to accommodate an expanding user base (*see* SC002, SC013).[1]

---

[1] Broker Genius also considers the AutoPricer v.3 source code to be a trade secret (*see* Am. Compl. ¶ 21), but it concedes that there is no evidence that defendants misappropriated – or even accessed – that source code (Tr. 105:22-106:1).

At the preliminary injunction hearing, Dr. Koskinen defined software architecture as "the overall organization of a computer system, how the different elements of the functionality or infrastructure [are] organized." (Tr. 99:24-100:1.) He analogized it to the manner in which "the different systems of [a] car, braking system versus the drive train, are organized." (Tr. 100:2-4.) According to plaintiff, the architecture of AutoPricer v.3 corresponds to the software component "Dynamic Automatic Ticket Pricing System" (SC001), which Dr. Koskinen describes somewhat amorphously as the "platform" and "system" for AutoPricer v.3 in his expert report. (Pl.'s Post-Hearing Mem. 4; Koskinen Expert Report, PX-62, Ex. C at 1.1.) Although there is substantial overlap between the architecture of the AutoPricer v.3 software and its user interface, the architecture also apparently encompasses the underlying structure of the pricing application and the manner in which it is integrated with brokers' POS ticket inventory systems and ticket exchanges. (PX-62, Ex. C at 1.1.)

Broker Genius claims that the trade secrets of AutoPricer v.3 are not limited to its backend structures, but also include the software's user-facing UX/UI (SC003). At the preliminary injunction hearing, Dr. Koskinen explained that UX/UI encompasses three general concepts: the design of the "cosmetic" "graphical elements" of a software program, the sequence of workflows and the processes by which users interact with that software, and the impressions and "attitudes" that a user has when interacting with that software. (Tr. 101:19-102:13.) The UX/UI of AutoPricer v.3 contains a collection of "widgets" – interactive elements that accept various forms of inputs from users, perform calculations, and present the results back to the users. (Tr. 100:19-101:5.) Broker Genius contends that it made deliberate design choices to ensure that these widgets appear and interact with each other in a way that the ticket brokers who use AutoPricer would find intuitive and helpful to achieving their objectives in reviewing inventory and pricing tickets.

The specific widgets identified as common to both AutoPricer v.3 and defendants' TickPricer product are an "events list widget" (SC004), which compiles the event listings pulled from the POS of ticket inventory systems (*e.g.*, SkyBox) and allows users to filter and search for specific events; an "inventory list widget" (SC005), which permits users to interact with their

ticket inventories for various events; a "pricing widget" (SC006), which allows users to set rules for pricing tickets based on the prices of competing tickets ("comps") and incorporates sub-widgets for identifying those "comps" by the zones, sections, and rows of any given venue (*e.g.*, Barclays Center) (SC007, SC008, and SC009), creating profiles to save pricing rules that the users intend to re-use (SC010), and setting prices for season tickets (SC011); and a "groups widget" (SC012), which enables users to create pricing rules for multiple listings at once.  AutoPricer v.3's UX/UI organizes and coordinates these various widgets to provide the full functionality of the software.

The last type of trade secret claimed by Broker Genius is comprised of AutoPricer v.3's solutions to scalability problems that arise in any dynamic automatic ticket pricing software.  Scalability refers to the manner in which an automatic pricing software can accommodate a growing number of users by processing an increasing frequency of inputs and calculations.  (*See* Tr. 156:5-18.)  Dr. Koskinen explained both at the hearing and in his expert report that Broker Genius was able to address this challenge by designing an "architecture for scalability" (SC002) comprised of "algorithms and implementations" to ensure that the price changes for events are published at a frequency that varies based on the imminence of the event itself.  (Koskinen Expert Report, PX-62, Ex. C at 1.2; Tr. 156:23-157:7.)

By ensuring that AutoPricer v.3 uses different "cycling speeds" for different tiers of events, Broker Genius is able to prioritize urgent price changes and thereby accommodate an increased number of users despite the bandwidth limitations of the ticket exchange servers with which it is integrated.  AutoPricer v.3 also ensures that it can process a growing user base by using "concurrent" price calculations while also controlling the number of simultaneous calculations to prevent simultaneous edits of the same data.  (Koskinen Expert Report, PX-62, Ex. C at 1.13 (describing the "Multi Threaded Pricer" software component (SC013)).)

## C.   Broker Genius's Protection of its Trade Secrets

Broker Genius's witnesses testified that the company takes measures to protect the confidentiality of its purported trade secrets.  Broker Genius obligates its employees to sign and abide by an Employee Handbook, which

contains a confidentiality provision broadly identifying "information regarding the Company's intellectual property, including its technology and products" as proprietary and/or confidential information. (Broker Genius Employee Handbook, PX-53 at 9; Tr. 207:23-25, 209:3-17, 211:10-17.) Broker Genius also requires its employees to sign employment agreements that contain nondisclosure clauses. (Tr. 207:25-208:2, 209:17-23, 213:7-15, 216:11-217:7.) Furthermore, Broker Genius also ensures that any terminated employees immediately "lose access to any confidential information that they may have." (Tr. 221:22-222:4.) In addition, Broker Genius retained an independent auditor, Codete, to examine, among other issues, whether Broker Genius was adequately "protecting its intellectual property." (Tr. 158:21-159:13; *see also* Tr. 208:7-13.) The Codete report found that there were no major security flaws in Broker Genius's backend architecture. (Codete Audit Report, PX-57 at 18-19.)

Although Broker Genius promoted previous iterations of its AutoPricer product to potential customers by widely publishing screenshots of the software,[2] it has not made the user interface of AutoPricer v.3 available to the general public. Sherman testified that the company "do[es] whatever [it] can, from a sales and marketing perspective, to be able to give a taste of what the Broker Genius and AutoPricer product is without disclosing [its] trade secrets." (Tr. 222:9-12.) For example, instead of publishing a "step-by-step" demonstration on its website, the company promotes AutoPricer by using a cartoon video that speaks in only broad terms about the software's capabilities. (Tr. 222:13-23.) Similarly, Broker Genius's Vice President of Sales, Zachary Ellman, testified that when he gives three- to eight-minute product demonstrations to potential customers, he discloses only "the general concept" of AutoPricer v.3, which does not permit viewers to understand the

---

[2] Specifically, Broker Genius published screenshots of Price Genius – a predecessor software product with similar functionality to AutoPricer v.3 (Tr. 62:3-63:5) – on Broker Genius's own website (Screenshot of Archived Copy of Broker Genius Website, Defs.' Pre-Hearing Mem., Ex. F), on a website used to solicit investments from angel investors (Screenshot of Images from Broker Genius's Angel List Profile, Defs.' Pre-Hearing Mem., Ex. H), and on a large, annotated banner that Broker Genius used as the backdrop for its booth at a trade show in Las Vegas (Price Genius Trade Show Banner, DX-27; Tr. 59:20-61:10).

organization of its architecture or the intricacies of its UX/UI. (Tr. 33:17-34:11.)

Despite the precautions Broker Genius takes in its marketing of AutoPricer v.3, the record shows that Broker Genius nevertheless discloses each of its alleged trade secrets to its customers. AutoPricer v.3's users have constant access to its UX/UI by virtue of their interaction with the software. Additionally, Broker Genius has a team of dedicated trainers who "spend hours and hours and hours" training their customers on how to use each of the features and widgets of AutoPricer v.3. (Tr. 80:21-22.) This training occurs over the course of a 30-day trial period and follow-up training is generally held once a customer signs up for a full license. (Tr. 36:24-37:1.) Broker Genius also provides both its trial and fully licensed customers with user guides (BG User Training Manual, DX-20), tutorial videos (*see* Email from Ellman to Zalta, May 13, 2015, DX-56), and emails explaining how to use new features that are periodically added to the AutoPricer v.3 software (New Features Memo, DX-18; Email from Broker Genius to Elliott Shamah, March 8, 2017, PX-20). (*See also* Tr. 234:4-20, 237:4-12, 238:25-240:8.) In addition, Broker Genius discloses to its customers information about its "cycle" durations – the frequency with which prices are updated for various events based on how soon the event will take place – which is the basis of Broker Genius's scalability solution. (*See* Email from Broker Genius to NRZ, Nov. 18, 2016, PX-26; *see also* Email from Broker Genius to Abe Harary, Feb. 23, 2017, Defs.' Post-Hearing Mem., Ex. A.)

Broker Genius's witnesses also testified that the company only grants this extensive access to its trade secrets to customers who have agreed to restrictions on their use of the software. Anyone who wishes to sign up for a license to use Broker Genius must first create a password-protected account and click on a box to assent to Broker Genius's "terms of use" – a phrase that appears as a hyperlink and links to a copy of the Terms of Use document. (Tr. 122:6-12.) These Terms of Use govern all users who use AutoPricer v.3 for a 30-day trial period. (Tr. 222:5-7.) Sherman explained that once a customer agrees to the Terms of Use, "that means they've signed up and we would give them as many training sessions as they want at that point." (Tr. 463:16-18.)

The written Terms of Use require users to agree not to "[m]odify, adapt, sub-license, translate, sell, reverse engineer, decompile or disassemble any portion of the Site or Apps or otherwise attempt to derive any source code or underlying ideas or algorithms of any part of the Site or Apps." (Terms of Use, updated June 12, 2014, PX-56 at 3.) In addition, users must agree not to "[r]eproduce, modify, display, publicly perform, distribute or create derivative works of the Site or Apps or Content." (*Id.* at 4.)

Broker Genius users who wish to subscribe to longer term contracts have the opportunity to sign the Broker Genius Service Agreement ("Service Agreement"). (Tr. 222:7-9, 460:19-24.) But because the Service Agreement is not used by those Broker Genius customers who license the AutoPricer software on a month-to-month basis, the majority of Broker Genius customers – approximately sixty percent – are covered solely by the Terms of Use. (Tr. 460:19-462:20.)

Pursuant to the Service Agreement executed by customers who have a license to use AutoPricer for a term longer than one month, users agree not to "reverse engineer, decompile, clone, copy or otherwise obtain a record or index of the source, object or compiled code of the Software" (Service Agreement, PX-8 at § 6.2) or to "distribute, disseminate, sublicense, copy, modify, reverse engineer, decompile, translate, dissemble or create a source code equivalent of or derivative of the Software or allow others to do so" (*id.* at § 6.4). In addition, users must "acknowledge that the source code and underlying structure and algorithms of the Software are the property and proprietary trade secrets" of Broker Genius. (*id.* at § 6.4.) The Service Agreement's merger clause specifies that the agreement "supersedes" any other communications regarding its subject matter (*id.* at § 12), and another clause stipulates that the licensee's contractual obligations survive its termination (*id.* at § 7).

## D. Defendants' Relationship with Broker Genius

Defendant NRZ Entertainment, LLC, is a company involved in the ticket broker business and is presently owned by defendants Nathan Zalta and Michael Shamah.

NRZ's employees first heard about Broker Genius in May 2015 and reached out to Broker Genius to learn more about automatic ticket pricing and to receive a demonstration of AutoPricer v.3. (Tr. 487:7-15, 488:21-25.) Shamah promptly signed NRZ up for a 30-day trial of Broker Genius's "full-service" subscription model. (Tr. 492:19-22.) In the process of creating an account, he or another NRZ representative assented to Broker Genius's Terms of Use.[3] (Broker Genius Client Account Creation Dates, PX-92 at 9.)

By using the "full-service" subscription model, NRZ authorized a designated pricing representative from Broker Genius to price NRZ's ticket inventory using Broker Genius's technology. (Tr. 494:7-24.) Although Shamah testified that he was initially dissatisfied with the service, he agreed to undertake a second 30-day trial of the "full-service" offering several months later, in November 2015. (Tr. 495:8-496:11.)

Upon the expiration of its second trial period, NRZ did not become a "full service" customer. Instead, at the end of December 2015, NRZ entered into a trial subscription for Broker Genius's alternative "self-service" offering, under which – instead of relying on a Broker Genius representative to price its tickets – NRZ would use the AutoPricer v.3 technology to price its own inventory. (Tr. 505:21-506:4.) After the conclusion of this 30-day trial period, NRZ agreed to enter into a full license to use the AutoPricer v.3 product for a one-year term commencing on February 3, 2016. Shamah signed the Service Agreement on behalf of NRZ on February 22, 2016. (*See* PX-8.)

Throughout the course of NRZ's relationship with Broker Genius, Broker Genius representatives conducted multiple training sessions and fully explained the AutoPricer software's functionalities and capabilities. Promptly after NRZ signed up for its first 30-day trial service, Zachary Ellman, Broker Genius's Vice President of Sales, conducted a six-hour training session at Zalta's house to train him on the use of AutoPricer v.3.

---

[3] Although Shamah and Zalta both testified that they could not recall clicking on or otherwise assenting to the Terms of Use (Tr. 492:23-25, 534:6-12, 536:16-24, 537:4-5 (Shamah), 631:18-22 (Zalta)), Broker Genius's records show that an account was created in Shamah's name on May 12, 2015 (PX-92 at 9), and defendants have not disputed plaintiff's assertion that a user cannot create a Broker Genius account without first clicking on a box to assent to the Terms of Use.

(Tr. 37:3-15; Tr. 508:4-13.)  Ellman then continuously discussed the service with Shamah during the course of NRZ's trial and license subscriptions.  (Tr. 35:8-24.)  According to Ellman, it was standard practice for Broker Genius to provide continuous training support, but the training he provided to NRZ was "definitely on the more excessive end" of what is typical for Broker Genius customers.  (Tr. 36:15-22.)

### E.    Defendants' Simultaneous Development of TickPricer

At the same time that NRZ was using AutoPricer v.3 and receiving Broker Genius's support and training in using its software, NRZ began to develop its own automatic ticket pricing product:  TickPricer.  Although there is no evidence that NRZ accessed Broker Genius's source code, it is also abundantly clear from the documentary evidence and witness testimony that defendants closely modeled TickPricer on AutoPricer v.3 and relied heavily on their knowledge of Broker Genius's product to build their own software.

Shamah testified that the reason that NRZ decided to create TickPricer in the first place was that he and Zalta wanted to improve on a concept that they believed had great potential but was being "poorly executed" by Broker Genius.  (Tr. 520:22-23.)  Shamah testified that by June 2016, NRZ was losing money using AutoPricer v.3 as a result of bugs that led NRZ's tickets to be priced against "comps" that improperly included NRZ's own inventory.  According to Shamah, this created a situation in which NRZ was essentially competing against itself in a race to the bottom.  (Tr. 514:13-516:11, 518:2-9; Email from Shamah to Ellman, June 20, 2016, DX-57; *accord* Tr. 577:25-579:3 (Zalta testifying that he was also familiar with bugs in the Broker Genius software).)

In order to build NRZ's own pricing software, Zalta reached out to a developer named Saqib in June 2016.  (Tr. 579:21-580:1; *see also* Deposition of Nathan Zalta, May 18, 2017, Pl.'s Pre-Hearing Mem., PX-80 at 113:10-11.)  Zalta sent Saqib a three-page PDF document containing heavily annotated screenshots of the AutoPricer v.3 user interface – specifically identified in the PDF as "Brokergenius Pricer."  (Annotated Screenshots Sent to Saqib, Pl.'s Pre-Hearing Mem., PX-31; Tr. 580:12-17.)  The annotations contain notes explaining the purposes of various elements of AutoPricer's interface (*e.g.*, "Groups," "Section," "Broadcast Status," and "# of tickets to compete

against") and also appear to provide instructions to the software developer (*e.g.*, "Not Needed"). (Ex-31.) At the hearing, Zalta testified that the reason he sent this PDF to Saqib was that Saqib "had no knowledge of the ticket broker industry" and Zalta "needed to show him that all the information could be pulled directly from StubHub or Sky Box." (Tr. 580:18-21.)

Although NRZ did not hire Saqib to create its software based on Broker Genius's product in June (Tr. 580:22-581:5), two months later, Zalta went to UpWork.com – a platform linking freelancers to software development projects – and posted a job seeking a developer to build an automatic ticket pricing software (UpWork Posting, DX-41). Defendant Joseph Bassil, a developer who builds automation software through his company Gontham LLC, responded to Zalta on August 11, 2016. (UpWork Correspondence between Zalta and Bassil, DX-40 at NRZ_000047.) As soon as Bassil responded to Zalta's posting of the job, Zalta sent Bassil a nine-page PDF document entitled "Pricing Tool Directions," to detail the requirements for the software he wanted developed and to confirm that Bassil would be able to "100% complete this project perfectly according to specifications." (DX-40 at NRZ_000047; Pricing Tool Directions, DX-70.) Like the PDF document that Zalta had sent to Saqib several months earlier, this document included detailed annotated screenshots taken directly from plaintiff's AutoPricer v.3.

Specifically, the 9-page document that Zalta sent to Bassil contained four pages of screenshots of the AutoPricer v.3 user interface, with annotations identifying various features and functionalities that were "[n]eeded in [the] [p]ricing [s]oftware" that Bassil was being asked to develop. (DX-70 at NRZ_000106; *see also id.* at NRZ_000105-08.) It also contained two pages of annotated screenshots of the SkyBox POS – the publicly available application programming interface ("API") from which a broker would pull their inventory – as well as two pages of annotated screenshots of a sample StubHub event page. (*Id.* at NRZ_000101-104.) Notably, the PDF did *not* contain any explicit references to Broker Genius or its proprietary products. Zalta merely identified the screenshots of AutoPricer v.3 as having been taken from an unnamed "sample pricing software." (*Id.* at NRZ_000108.) In addition, before Zalta sent the screenshots to Bassil, he went to the trouble of redacting Broker Genius's client support telephone number from the last

screenshot in the PDF, thereby hiding the screenshot's source. (*See* Letter from Jason Cooper to the Court, July 11, 2017, ECF No. 90 at 1.)

Zalta testified that the reason he sent this PDF to Bassil was to show Bassil – who had no experience in the ticket broker industry – "that all the information that needed to be pulled for this software was to come from two places": SkyBox and StubHub. (Tr. 587:11-16; *see also* Tr. 634:24-635:5.) The Court does not credit that testimony; rather, Zalta sent Bassil the AutoPricer v.3 screenshots in order to have Bassil copy AutoPricer's functionalities.

NRZ hired Bassil for the development job on August 16, 2016, five days after he had responded to Zalta's job posting. (DX-40 at NRZ00047-48.) Bassil went on to build TickPricer in merely four months, even though he was working on this project only part-time. (Tr. 297:3-12.) He provided a functioning version to NRZ by "middle or late December" of 2016. (Tr. 298:6-8, 598:5-6.) NRZ paid Bassil $6,000 for his initial development work and – because the product was still a "prototype" software that was not "100 percent complete" – NRZ has continued to pay him $500 to $1,000 per week for maintenance and bug fixes. (Tr. 345:5-346:2, 598:10-17.)

Bassil, Zalta, and Shamah all vigorously denied on the stand that they had relied on NRZ's detailed knowledge of AutoPricer v.3's product when building TickPricer. According to Bassil, he was able to construct TickPricer relatively quickly and cheaply because he was building off of a pre-made application "framework" that he recycled from his prior development projects (Tr. 303:24-304:16), because he used a generic user interface (Tr. 304:17-22), and because he already had experience with designing a "similar" product – an "Amazon price matching tool" (Tr. 281:19-282:10). Bassil testified that, while developing TickPricer, he "did not really pay too much attention" to the nine-page PDF that Zalta had sent him (Tr. 357:1-2) because he simply had "no need to" refer to the screenshots of the "sample pricing software," which we know was AutoPricer v.3 (Tr. 308:13). According to Bassil, he only referred back to the PDF's images of the SkyBox POS to understand "what data points [he] need[ed] to pull from the point of sale." (Tr. 308:16-20.)

Both Zalta and Bassil further denied that Bassil was ever able to use AutoPricer v.3 or even that Zalta ever showed Bassil how AutoPricer v.3

functioned.  (Tr. 303:2-4, 308:21-24 (Bassil), 592:23-593:8, 640:5-7 (Zalta).)  This is not credible given the fact that Zalta sent Bassil screenshots of AutoPricer v.3 that were annotated to describe the software's functionality.  In addition, the evidence shows that Bassil and Zalta spoke at length and frequently through Skype (*see* Skype Correspondence between Zalta and Bassil, PX-34) and shared computer screens with one another throughout the course of developing TickPricer  (Tr. 349:5-7).  And their written communications reveal multiple occasions on which they alluded to the prospect of Zalta (i) granting Bassil access to AutoPricer v.3, (ii) showing Bassil how the software looked and functioned, or – at the very least – (iii) explaining in detail how it functioned.

For instance, on August 16, 2016 – the day Zalta awarded the bid to Bassil – he asked Bassil, "What would be the next steps?  Do you need me to create a list of every single small aspect that the software should have?  I can walk you through our current software now. Let me know."  (DX-40 at NRZ_000048.)  NRZ's "current software," of course, was AutoPricer v.3.  The next day Zalta asked, "Would you like to speak on skype so I can share my screen[?]" and Bassil replied, "yes, let's do that."  (*Id.*)

At the hearing, Bassil and Zalta could not recall if in fact they shared screens at this time, but testified that if they *had* done so, Zalta would have only walked Bassil through the POS software from which NRZ's inventory would be pulled – not AutoPricer v.3.  Bassil said:  "I honestly don't remember what we did on that conversation, but, again, based on how I work, what I would have been interested in is where is your inventory and how do I get to it."  (Tr. 301:13-16.)  When Zalta was cross-examined on the same topic, after a substantial hesitation, he gave an answer similar to that offered by Bassil:  "At that point the most relevant information [Bassil] would need to get started was the POS API information. . . . So that's the software I would have shown him at that time."  (Tr. 638:19-639:7.)

One month later, on September 14, 2016, Bassil asked Zalta:  "Is it possible to give me access to the current repricing tool you're using?"  (DX-40 at NRZ_000050.)  Again, that "tool" was AutoPricer v.3.  Bassil explained that he sought access to NRZ's current software because he wanted to "produce a software that is familiar to [Zalta]."  (Tr. 303:12-21.)  However, both Bassil

14

and Zalta claimed that Zalta never responded to Bassil's request. (Tr. 303:9-11 (Bassil), Tr. 591:17-20, 592:9-17 (Zalta).) According to Zalta, he ignored Bassil's request because he "wanted [Bassil] to build a totally unique pricing tool" and he "didn't want [Bassil] using the Auto Pricer as a basis." (Tr. 592:14-17.) Zalta added that he "did not think it was a good idea" to give Bassil access to AutoPricer v.3 (Tr. 594:2); Zalta explained that, while he was not certain whether his agreements with Broker Genius prohibited him from granting access to a third party, he preferred to be "extra careful." (Tr. 594:1-595:16.)

Because NRZ was still a Broker Genius client while it was building TickPricer, Zalta was able to compare his new tool to AutoPricer v.3's interface and technology. For instance, in October 2016, after Bassil gave Zalta access to a non-functioning "proof of concept" version of TickPricer, Zalta "took an image of the proof of concept," "modified it" by adding new elements, and sent it back to Bassil. (Tr. 372:2-21.) The modified proof of concept that Zalta sent Bassil includes screenshots of *AutoPricer*'s widgets that Zalta had pasted from Broker Genius's user interface. (*See* Screenshot of Modified Proof of Concept, PX-41; Screenshot of Modified Proof of Concept, PX-61; Tr. 380:8-22.)

In another instance, on December 8, 2016, someone at NRZ forwarded Zalta a copy of an earlier email that Broker Genius had sent to NRZ, in which Broker Genius disclosed the durations between each of AutoPricer v.3's pricing cycles. (Email from NRZ to Zalta, Nov. 18, 2016, PX-26; Tr. 651:4-652:15.) The very same day, Zalta sent that information to Bassil. (Skype Correspondence between Zalta and Bassil, PX-34 at GONTH_000220; Tr. 653:3-20.)

Once TickPricer became operational in December 2016, Shamah cancelled NRZ's AutoPricer v.3 license, one month early. (Email from Shamah to Ellman, Dec. 20, 2016, DX-29.) However, even after NRZ cancelled its subscription to AutoPricer v.3, it continued to receive updates about Broker Genius's software through its utilization of a beard: At the same time that Bassil was finalizing his TickPricer product for NRZ, Elliott Shamah – a part-time ticket broker and defendant Michael Shamah's brother – signed up to become a Broker Genius client. (Tr. 564:17-24 (suggesting that Elliott signed

up in mid-December 2016); *but see* Broker Genius Client Account Creation Dates, PX-92 (showing that Elliott created his Broker Genius account on November 15, 2016).) On January 19, 2017, Elliott requested a pricing sheet from Broker Genius and immediately forwarded it to NRZ. (Email from Elliott Shamah to Nathan Zalta, Jan. 19, 2017, PX-17.) Similarly, in March 2017, Elliott forwarded his brother at NRZ an email from Broker Genius to its customers announcing feature updates. (Email from Elliott Shamah to Michael Shamah, Mar. 12, 2017, PX-20.) And on March 21, 2017, Elliott sent his brother an email describing one of Broker Genius's marketing initiatives, noting that Broker Genius was "def starting to feel the pressure lol." (Email from Elliott Shamah to Michael Shamah, Mar. 21, 2017, PX-21.) Michael Shamah denied that his brother ever worked for NRZ or that NRZ ever asked him to pass along information from Broker Genius, but in a delightful bit of understatement, acknowledged that Elliott "could have thought he was helping" NRZ by forwarding this information. (Tr. 564:7-8; *see also* Tr. 561:18-19, 562:23-563:1.) This Court is aware of absolutely no other reason he would have done so.

### F. Instantiation of AutoPricer v.3's Software Components in TickPricer

The TickPricer software that Bassil built for NRZ replicates many of AutoPricer's essential features and functions. According to Dr. Koskinen, the two products share a "substantial overlap" in their software architecture, UX/UI, and solutions to scalability problems. (Koskinen Expert Report, PX-62 at § 1.5; *see also* Tr. 97:17-18.)

Although defendants' expert, Mr. Stephen Gray, opined that "[t]he Auto Pricer and TickPricer architectures are very different" and that "[t]he architecture of the TickPricer application is much simpler" (Gray Expert Report, DX-61 at ¶ 71), he based this opinion largely on an inspection of the source code for each application (*id.* at ¶¶ 50, 60, 69, 74). As Dr. Koskinen testified, differences in the source code are not dispositive because there are multiple ways to implement the same software components through different coding instructions. (Tr. 119:5-120:11). Notably, Mr. Gray never relied on the actual experience of using the TickPricer and AutoPricer v.3 software programs in developing his expert report (Tr. 419:16-18) and he did not

express an opinion on the vital question of whether each of the software components identified by Broker Genius as its AutoPricer trade secrets were instantiated in TickPricer (Tr. 431:5-13). In fact, Mr. Gray's own rebuttal expert report shows that each of the interoperating widgets that appears in AutoPricer v.3's UX/UI (*e.g.*, the inventory list widget, the groups widget) has at least some analog in TickPricer. (Gray Rebuttal Expert Report, DX-62 ¶ 19 & fig. 2.)

The parties' demonstrations of AutoPricer v.3 and TickPricer for the Court during the preliminary injunction hearing confirmed that, despite minor differences in the way in which the two programs organize and display certain information,[4] there are significant similarities in the way in which the programs allow users to pull their inventories from external sources, review the contents of those inventories, set pricing rules for individual events, seasons, *and* groups of tickets, and then interact with ticket exchanges in a manner that enables the programs to accommodate growing numbers of users. And while AutoPricer v.3 and TickPricer use different "cycling" speeds to publish pricing information onto ticket exchanges (Koskinen Expert Report, PX-62, Ex. C at 1.2; Gray Rebuttal Expert Report, DX-62 ¶ 45), the two programs both adopt the same method of publishing pricing updates by grouping events into tiers on the basis of how soon the event is going to take place.

### G. Defendants' Marketing of TickPricer and Its Impact on Broker Genius

NRZ did not just develop TickPricer to assist its own ticket brokering business; it also marketed this software to other brokers, in competition with Broker Genius's AutoPricer product.

---

[4] Among these minor differences are: different color schemes (Tr. 344:6-345:4); AutoPricer v.3 uses separate sub-widgets to enable users to select zones, rows, and sections, while TickPricer builds a similar functionality into a single pricing calculator widget (Tr. 340:2-341:7, 342:19-343:21); and TickPricer shows the average price of a pair of tickets in a particular zone, while AutoPricer v.3 shows the lowest price (Tr. 341:22-342:1).

Although defendants' witnesses gave contradictory testimony regarding whether or not TickPricer is currently being used by brokers outside of NRZ itself (*compare* Tr. 350:15-17 (Bassil) *with* 598:22-599:2 (Zalta)), the evidence unequivocally shows that NRZ began marketing its new software product in March of 2017.  At that time, NRZ sent an e-mail blast to potential users from a ticket broker directory (Tr. 599:3-14) and signed up twelve to thirteen users – many of whom were former Broker Genius customers (Tr. 600:1-5, 619:4-21; *see also* Compilation of Emails from Zalta and Eddie Nissim to Potential Clients, Mar. 14 – Apr. 3, 2017, PX-79).  To attract these customers, NRZ offered a "guarantee to cut [their] current B[roker] G[enius] rate by 5%" (Email from Eddie Nissim to John Andrews, Mar. 16, 2017, PX-4 at NRZ_003002; *see also, e.g.,* PX-79 at NRZ_0003011, NRZ_002923) and even falsely represented that TickPricer was "a branch off from" Broker Genius (PX-79 at NRZ_002753, NRZ_003029).

Zalta testified that, as a result of this lawsuit, NRZ has decided not to charge fees to any of its current users and not to accept any new users for the duration of the litigation.  (Tr. 601:18-25.)  However, he also testified that if NRZ were to begin accepting users, its software would be able to accommodate a total of approximately thirty users within one or two months, which would yield approximately $250,000 in revenue.  (Tr. 602:6-603:13.)

Although Broker Genius has been "growing well" (Tr. 201:23) – it expanded from 13 to 170 users over the course of the last two years (Tr. 201:14-20) – its witnesses testified that this growth has been jeopardized by the introduction of TickPricer into the market.  According to Broker Genius's Vice President of Sales, Zachary Ellman, the company has lost customers to NRZ and has had to lower rates by up to 25% for some to induce them not to switch to TickPricer.  (Tr. 48:13-25.)  In addition, Dr. Koskinen testified that NRZ has distributed a video demonstrating the TickPricer product and that this video discloses multiple software components that originally appeared in AutoPricer v.3 without binding any viewers to secrecy.  (Tr. 165:25-168:13; *see also* TickPricer Tutorial Video, PX-7; PX-79 at NRZ_002749, NRZ_002750 (NRZ staff attaching link to the TickPricer Tutorial Video to emails sent to potential customers).)  Sam Sherman, Broker Genius's CEO, testified that he is especially concerned about the risk of additional customers either moving to TickPricer or building their own competitive pricing tools once they have

access to AutoPricer v.3's claimed trade secrets. He said that "there is a very real possibility" that the company will be "out of business" within a "period of months" if defendants are not enjoined. (Tr. 203:9-14.)

## III. STANDARD FOR A PRELIMINARY INJUNCTION

A preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies" and courts have cautioned that it should be "used with great care." *Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (citation omitted). Injunctions "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Moore v. Consolidated Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

In the Second Circuit, "[a] party seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal alterations and citation omitted); *see also Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015); *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

## IV. LIKELIHOOD OF SUCCESS ON THE MERITS

To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent." *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)).

Because Broker Genius does not seek a preliminary injunction on the basis of its claims for copyright infringement, breach of contract, tortious interference with a business relationship and unjust enrichment (*see* Pl.'s Pre-Hearing Mem. 17 n.25), the Court is limited to considering whether Broker

Genius has a likelihood of success on the merits of its claims for misappropriation of trade secrets pursuant to New York law and the Defend Trade Secrets Act of 2016 ("DTSA").

To prevail on a misappropriation of trade secrets claim pursuant to New York law, the movant bears the burden of establishing: "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999) (citations omitted).

The DTSA (codified in 18 U.S.C. § 1831, *et seq*.), which created a federal cause of action for the misappropriation of trade secrets used in interstate commerce, requires that the plaintiff establish "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016); *see also* 18 U.S.C. § 1839(5). The DTSA's definition of "improper means" includes "misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy," but expressly excludes "reverse engineering" and "independent derivation." 18 U.S.C. § 1839(6)(A)-(B).

In this case, and based on the evidence adduced to date, Broker Genius is likely to be able to show that defendants improperly made use of the information that Broker Genius alleges to be its trade secrets in breach of the agreement between the parties. However, Broker Genius is not likely to succeed in its trade secret misappropriation claims because it is not likely that it will be able to show that the relevant information qualifies as trade secrets.

### A.  Misappropriation

One of the ways in which a plaintiff may establish that trade secrets were misappropriated under New York law is by showing that a defendant "used the trade secrets in breach of an agreement" between the parties. *Schroeder v. Pinterest, Inc.*, 133 A.D.3d 12, 28 (2d Dep't 2015); *see also N. Atl. Instruments*,

*Inc. v. Haber,* 188 F.3d 38, 44 (2d Cir. 1999) (applying New York law).[5] On the basis of the evidence presented at the preliminary injunction hearing, Broker Genius is very likely to be able to show that NRZ and its principals made use of the information that plaintiff claims to be its trade secrets – the fourteen software components which comprise the software architecture, UX/UI, and scalability architecture of AutoPricer v.3 – in a manner that breached NRZ's contractual obligations not to "distribute," "disseminate," "copy," "reverse engineer," or "create a source code equivalent of" the AutoPricer v.3 software.[6]

According to the plain terms of the Service Agreement, which governed NRZ's license to use AutoPricer v.3 during the time that NRZ developed its TickPricer product, NRZ was not permitted to "distribute, disseminate, sublicense, copy, modify, reverse engineer, decompile, translate, dissemble or create a source code equivalent of or derivative of the Software or allow others to do so." (Service Agreement, PX-8 § 6.4.) Furthermore, the Service Agreement defined the word "Software" to encompass "any form" of the AutoPricer v.3 software itself, as well as any "related documentation delivered to or downloaded by [the licensee]." (*Id.* at § 1.2.)

At the preliminary injunction hearing, defendant Zalta admitted that he distributed screenshots of the AutoPricer v.3 user interface – along with his annotations that explained how the software and its various widgets functioned – to at least two software developers (Saqib and Bassil) while the

_____

[5] By contrast, the DTSA's definition of "misappropriation" prohibits the disclosure or use of a trade secret only if that secret was "acquired" improperly, including through a breach of a contractual "duty to maintain secrecy." 18 U.S.C. § 1839(5)(b)(i) (emphasis added), § 1839(6)(A). Broker Genius cannot establish a likelihood of success in its DTSA claim for all the reasons that it cannot establish success on its state law claim, but also because the evidence in this record does not show that defendants improperly acquired the purported trade secrets; NRZ and the individual defendants were Broker Genius customers when they first acquired the relevant information.

[6] Although this discussion necessarily implicates the likelihood of plaintiff's success on its breach of contract claim, the Court does not now definitively decide the merits of that claim, as it has not yet been fully briefed by the parties and, as noted above, Broker Genius is not seeking an injunction on the basis of that claim.

Service Agreement was in effect. Zalta also admitted that he forwarded Bassil information from Broker Genius about the frequency with which AutoPricer v.3 updates its prices for events depending on their imminence. On the basis of this evidence, plaintiff is likely to succeed in showing that Zalta made use of the alleged trade secrets of AutoPricer v.3's UX/UI and scalability architecture by disclosing them to a third party and that he did so in breach of NRZ's agreement not to "distribute" or "disseminate" either the AutoPricer v.3 software (in any form) or documentation related to that software.[7]

Broker Genius is also likely to be able to show that NRZ breached the Service Agreement by "copy[ing]," "reverse engineer[ing]," and "creat[ing] a source code equivalent of" the Software or "allow[ing] others to do so."[8] (PX-8 § 6.4.) In the context of trade secret misappropriation cases – where it is "well recognized" that "misuse can rarely be proved by convincing direct evidence" and that defendants' witnesses will often "directly deny everything," *Q-Co Indus., Inc. v. Hoffman*, 625 F. Supp. 608, 618 (S.D.N.Y. 1985) (citation omitted) – copying can be established by showing that a defendant had "access" to the alleged trade secrets and that there is a "substantial similarity" between the original product which embodied those trade secrets and the alleged copy created by the defendant, *Fabkom, Inc. v. R.W. Smith &*

---

[7] Defendants contend that they did not misappropriate any alleged trade secrets because they gained access to them while they were "good faith" clients of Broker Genius. (Defs.' Pre-Hearing Mem. 13.) The Court has ample reason to doubt defendants' characterization of themselves as "good faith" clients given the evidence that they were actively developing a competing product while continuing to use Broker Genius's software; that they obtained additional information about Broker Genius's products through Shamah's brother even after terminating their license; and that, as soon as their own software was functional, they began to aggressively compete with Broker Genius. In any event, defendants' argument is misguided; the relevant issue in this case is improper *use*, not improper acquisition, of trade secrets.

[8] Although "trade secret law does not forbid the discovery of the trade secret by . . . reverse engineering, that is by starting with the known product and working backward to divine the process which aided its development or manufacture," *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974), "[t]here is general agreement that . . . a contractual provision against reverse engineering is enforceable," 1-1 Roger M. Milgrim, Milgrim on Trade Secrets § 1.05 (2017).

*Assocs., Inc.*, No. 95 CIV. 4552, 1996 WL 531873, at *9 (S.D.N.Y. Sept. 19, 1996) (citation omitted).

There is no question but that, as regular and well-trained users of the AutoPricer software, NRZ's principals had access to AutoPricer v.3's UX/UI and understood the way in which the software was organized, as well as the methods by which Broker Genius addressed scalability problems. Moreover, the similarities between the software architectures, UX/UI, and scalability solutions of AutoPricer v.3 and TickPricer dwarf the trivial differences that defendants have highlighted in their submissions. *See Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 148-49 (2d Cir. 1996) ("[T]he established law [is] that trade secrets need not be exactly copied in order to impose liability.") (citing *Cybertek Comp. Prods., Inc. v. Whitfield*, 203 U.S.P.Q. 1020, 1025 (Cal. Super. Ct. 1977)).

An inference of copying and reverse engineering is especially warranted here given the substantial evidence showing that defendants did in fact rely heavily on their familiarity with Broker Genius's alleged trade secrets when directing Bassil in his construction of TickPricer. *Cf. Fabkom*, 1996 WL 531873, at *11-*12 (granting preliminary injunction after concluding that "plaintiff will likely be able to prove some copying" of its software by a defendant who had formerly licensed the software in part because the directions given by the defendant to potential software developers were "influenced, if not dictated, by the structure of [plaintiff's] program[,] which [defendant] had been using for years").

In this case, the most glaringly obvious purpose of the annotated AutoPricer v.3 screenshots that Zalta sent Bassil in a nine-page document entitled "Pricing Tool Directions" was – as the title implies – for them to serve as a detailed template for the development of NRZ's own pricing tool. Given the nature of the document's annotations – describing "Information Needed in Pricing Software" (DX-70 at NRZ_000106) – and the fact that Zalta sent this PDF to Bassil in order to confirm that Bassil could complete the project "perfectly according to specifications" (DX-40 at NRZ_000047), Zalta's explanation that he was solely attempting to educate Bassil on the interactions between ticket pricing software and SkyBox and StubHub is

poppycock.[9]  The Court similarly questions the credibility of Bassil's testimony that he built TickPricer without "really pay[ing] too much attention" to the AutoPricer v.3 screenshots that Zalta had sent him.  (Tr. 308:13-20.)  After all, one month later, Bassil was still seeking access to the pricing tool that Zalta was using.  (DX-40 at NRZ_000050.)  And Zalta admitted that one of his goals in creating TickPricer was to "produce a software that [was] familiar" for his client.  (Tr. 303:12-21.)

Furthermore, although there is no direct evidence in this record that Zalta ever shared his screen with Bassil or ever enabled Bassil to log into the AutoPricer v.3 software, Zalta's professed insistence that he ignored Bassil's request for access to his current pricing software because he "wanted [Bassil] to build a totally unique pricing tool" (Tr. 592:14-17) is highly suspect.  Other evidence shows that Zalta was keenly interested in having Bassil replicate – or improve upon – the AutoPricer software.  Zalta sent Bassil a modified proof-of-concept in which he appears to have instructed Bassil to incorporate elements from AutoPricer v.3's user interface into the development of TickPricer (PX-41; PX-61) and Zalta also forwarded information to Bassil about the cycle frequencies used by AutoPricer v.3 (PX-34 at GONTH_000220).

Nonetheless, Broker Genius cannot prevail on its misappropriation of trade secrets claim – the sole claim on which it seeks a preliminary injunction – unless the information it alleges to be trade secrets actually qualifies as such.  As set forth in the following section, Broker Genius cannot make such a showing.

---

[9] Zalta's credibility is further eroded by his reliance on the same dubious explanation to describe his motivation for sending a three-page PDF comprised *entirely* of annotated screenshots of AutoPricer v.3 to Saqib, another developer.  The vast majority of annotations in that PDF contain no references to SkyBox or StubHub and are instead descriptions of AutoPricer's various widgets and features.  (*See* PX-31.)

**B. Whether Broker Genius's Software Components are Trade Secrets**

*1. Legal Standard*

New York courts define trade secrets with reference to section 757 of the Restatement of Torts.  According to this definition, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993) (citing Restatement of Torts § 757, cmt. b (1939)); *see also N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (describing New York law).  Thus, trade secrets are only "a subset of all commercially valuable information."  *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002).

To determine whether particular information can qualify as a trade secret, New York courts consider the following six factors:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Ashland Mgmt.*, 82 N.Y.2d at 407 (quoting Restatement of Torts § 757, cmt. b) (internal quotation marks and brackets omitted); *see also N. Atl. Instruments, Inc.*, 188 F.3d at 44.

These factors reflect the understanding that the "most important consideration" in determining whether information is a trade secret is "whether the information was secret."  *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986); *see also Ashland Mgmt.*, 82 N.Y.2d at 407 ("[A] trade secret must first of all be secret."); *Liveperson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 514 (S.D.N.Y. 2015); *Geritrex Corp. v. Dermarite Indus., LLC*, 910 F. Supp. 955, 961 (S.D.N.Y. 1996).

Courts' references to secrecy encompass two separate, but related, concepts:  (1) the "substantial exclusivity of knowledge of the formula, process, device or compilation of information," and (2) "the employment of precautionary measures to preserve such exclusive knowledge by limiting legitimate access by others" so that, "except by the use of improper means, there would be difficulty in acquiring the information."  *Delta Filter Corp. v. Morin*, 108 A.D.2d 991, 992 (3d Dep't 1985) (citing Restatement of Torts § 757, cmt. b (1939)).  Thus, although absolute secrecy is not required, the information claimed to be a trade secret must be cloaked with a "substantial element of secrecy."  *A.H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 16 (2d Cir. 1968).  However, "[i]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished."  *Structured Capital Solutions, LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 832 (S.D.N.Y. 2016) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984)).[10]

### 2.  Discussion

In this case, it is evident that Broker Genius's claimed trade secrets – which encompass the core functionalities and user interface of the AutoPricer software – are valuable to the company and to its competitors.  It is also clear that Broker Genius expended a substantial amount of resources – approximately $4 million – in developing those purported trade secrets.  (Tr. 49:13-50:8, 152:3-6.)

Instead of contesting these two elements, defendants argue that plaintiff has failed to identify its purported trade secrets with sufficient specificity and

---

[10] The DTSA adopts a definition of trade secrets that is substantially similar to the definition adopted by New York courts.  That statute describes trade secrets as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible," so long as (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means" by others.  18 U.S.C. § 1839(3)(A)-(B).

that the software components identified by plaintiff are not protectable as trade secrets because their elements were known outside of the business and because plaintiff failed to undertake reasonable measures to maintain their secrecy.

i.    Adequacy of plaintiff's identification of its trade secrets

Defendants' initial contention is that Broker Genius cannot succeed on its trade secrets claims because it has not identified "its trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated." *PaySys Int'l, Inc. v. Atos Se*, No. 14-CV-10105, 2016 WL 7116132, at *3 (S.D.N.Y. Dec. 5, 2016); *see also Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 244, 258-59, 263-64 (S.D.N.Y. 2014); *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05 Civ. 9292, 2008 WL 463884, at *10-*11 (S.D.N.Y. Feb. 20, 2008).  While neither the New York Court of Appeals nor the United States Court of Appeals for the Second Circuit has expressly required trade secrets to be identified with any particular degree of specificity, it is evident that a "vague and indefinite" piece of information cannot be protected as a trade secret.  *Big Vision*, 1 F. Supp. 3d at 258 (citing *Sit-Up*, 2008 WL 463884 at *11-*12); *see also Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 588-90 (2d Cir. 1963).

Although defendants are correct that Broker Genius has failed to describe certain of its fourteen software components with adequate specificity,[11] the Court is satisfied that Broker Genius has identified three particular types of alleged trade secrets in a manner that enables "the defendant [to] defend himself" and to "divine the line between secret and nonsecret information" so that "a jury can render a verdict based on a discriminating analysis of the evidence of disclosure and misappropriation." *Sit-Up*, 2008 WL 463884 at *11-*12.  In particular, plaintiff's fourteen software

---

[11] For example, plaintiff's expert, Dr. Koskinen, defines the "domain model" (SC014) as an "abstract concept" that embraces the "entities that the software manipulates and the relationships between these entities."  (Koskinen Expert Report, PX-62 at Ex. C, 1.14.) Neither Broker Genius nor Dr. Koskinen has ever defined these "entities" or attempted to explain how this software component is distinct from AutoPricer v.3's broader software architecture.

components generally fit into three categories that may be eligible for protection: software architecture, UX/UI, and specific solutions to addressing scalability problems in an automatic ticket pricing software.

There is no question that Broker Genius's use of tiers and different cycling speeds to address scalability is described with specificity in plaintiff's materials and constitutes a type of know-how or method that would be entitled to trade secret protection (*if* it were indeed kept secret). *See, e.g.,* *Norbrook Laboratories Ltd. v. G.C. Hanford Mfg. Co.*, 297 F. Supp. 2d 463, 483-84 (N.D.N.Y. 2003), *aff'd*, 126 F. App'x 507 (2d Cir. 2005).

With respect to AutoPricer v.3's UX/UI, Broker Genius has identified particular components, *i.e.*, widgets, of the user interface that it considers to be protectable trade secrets. Although there is a dearth of cases finding that a software's user interface is a trade secret,[12] the same principles that apply to other types of information apply here; the elements of a software's UX/UI can be a trade secret so long as the only people who can access them are bound by a duty to keep them confidential. *See AirWatch LLC v. Mobile Iron, Inc.*, No. 1:12-CV-3571-JEC, 2013 WL 4757491, at *3 (N.D. Ga. Sept. 4, 2013) (finding, at the motion to dismiss stage, that plaintiff could show that the functionality and appearance of its software could be trade secrets if plaintiff "show[s] that it worked to preserve th[eir] secrecy" by, *inter alia*, including "confidentiality provisions" in user license agreements); *cf. R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 276 (6th Cir. 2010) (finding that a product's user interface was not a trade secret because plaintiff failed to take reasonable steps to maintain its secrecy by failing to bind users to effective confidentiality agreements).

Finally, although a software's architecture is an inherently broad concept, the United States Court of Appeals for the Second Circuit and district courts in the Circuit have held that such information can be a trade secret. *See Integrated Cash Mgmt. Serv., Inc. v. Dig. Transactions, Inc.*, 920 F.2d

---

[12] *See IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) (elements of a user interface like "the appearance of data-entry screens" are "exceedingly hard to call trade secrets" because "things that any user or passer-by sees at a glance are 'readily ascertainable by proper means'").

171, 173-74 (2d Cir. 1990); *see also, e.g., Fabkom, Inc. v. R.W. Smith & Assocs., Inc.,* No. 95 Civ. 4552, 1996 WL 531873, at *6 (S.D.N.Y. Sept. 19, 1996) ("The source code, *format, structure, and organization* of the software is certainly not known outside the business.") (emphasis added).

> ii. The extent to which the information is known outside of the business

Defendants' expert, Stephen Gray, opined in his report and at the preliminary injunction hearing that AutoPricer v.3's software architecture and user interface cannot be trade secrets because certain of the software's individual widgets perform functions that are either common to all automatic pricing programs or are obvious automations of pricing practices that are well known within the ticket broker industry.[13] (Gray Rebuttal Expert Report, DX-62 ¶¶ 47, 48, 49, 50, 51, 52, 53; Tr. 411:9-416:17.) He made similar observations about Broker Genius's solution to scalability problems. (Gray Rebuttal Expert Report, DX-62 ¶¶ 43, 45.)

These opinions about the common and obvious nature of AutoPricer v.3's functions and interface are not dispositive. First of all, "novelty – at least as that term is used in patent law – is not required in a trade secret." *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.,* 118 F.3d 955, 968 (2d Cir. 1997); *see also Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 476 (1974) (discussing Ohio law). Moreover, even if the functions of each of AutoPricer v.3's widgets are well-known in the ticket broker and automatic pricing industries, their unique combination in the AutoPricer v.3 architecture is still protectable as a trade secret. In *Integrated Cash Management Services v. Digital Transactions, Inc.* 920 F.2d 171 (2d Cir. 1990), the Court of Appeals for the Second Circuit affirmed a district court's decision to grant injunctive relief to a software developer claiming that the manner in which its non-secret utility programs were arranged to interact with one another was a trade secret. The Second Circuit, applying New York law, held that "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is

---

[13] Mr. Gray relies essentially exclusively on conversations with defendants Bassil and Zalta for his opinions about common practices in the automatic pricing industry and ticket broker industry, and the Court thus puts little weight on his opinions.

in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Integrated Cash Mgmt.*, 920 F.2d at 174 (quoting *Imperial Chem. Indus. Ltd. v. Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir. 1965)).[14]

In this case, there is no question but that, no matter how generic or obvious the individual widget components of AutoPricer v.3 may have been, Broker Genius arranged them all into a unique and synergistic system architecture. Defendants have conceded that, until they built TickPricer, AutoPricer was "the only tool on the market" that allowed brokers to manage their ticket inventory while also automatically pricing them for resale on exchanges such as StubHub. (Tr. 542:5-7, 659:17-19; *see also* Deposition of Michael Shamah, May 16, 2017, Defs.' Pre-Hearing Mem., Ex. I at 71:9-24.) While Mr. Gray's report does identify several "other ticket pricing applications," it does not explain the degree to which those programs share the functionalities of AutoPricer v.3. (Gray Expert Report, DX-61 ¶ 47.) Moreover, plaintiff's expert, Dr. Koskinen, has identified significant functional and aesthetic differences between at least one of those allegedly competitive programs and AutoPricer v.3. (Tr. 160:14-7; *see also* Koskinen Rebuttal Expert Report, PX-63 at 5.3). *Cf. Wellogix, Inc. v. Accenture, LLP*, 823 F. Supp. 2d 555, 562-63 (S.D. Tex. 2011) ("[T]hough the functions of Wellogix's software were known to the industry, other software companies did not have identical functions in their software."), *aff'd*, 716 F.3d 867 (5th Cir. 2013).

---

[14] *See also Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) (applying New York law); *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 804-05 (S.D.N.Y. 2008); *Anacomp, Inc. v. Shell Knob Servs., Inc.*, No. 93 CIV. 4003, 1994 WL 9681, at *8 (S.D.N.Y. Jan. 10, 1994) (applying New York law); *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1230 (W.D.N.Y. 1994) (applying New York law); *Computer Assocs. Int'l, Inc. v. Bryan*, 784 F. Supp. 982, 988 (E.D.N.Y. 1992) (applying New York law); *accord* 1 Roger M. Milgrim, *Milgrim on Trade Secrets* ¶ 1.08[5] (2017); *Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 437-38 (S.D.N.Y. 1996) (applying Minnesota law); *Harbor Software, Inc. v. Applied Sys., Inc.*, 887 F. Supp. 86, 90-91 (S.D.N.Y. 1995) (applying Illinois law).

      iii.  The extent of measures taken by the business to guard the secrecy of the information

Even if AutoPricer v.3's software architecture, UX/UI, and scalability solutions are not matters of public knowledge or general knowledge in the industry, they can only be trade secrets if Broker Genius employed some "precautionary measures to preserve [its] exclusive knowledge by limiting legitimate access by others." *Delta Filter Corp. v. Morin*, 108 A.D.2d 991, 992 (3d Dep't 1985) (citing Restatement of Torts § 757, cmt. b (1939)). Here, because the UX/UI of AutoPricer v.3 is made readily apparent to every single user of the software and because Broker Genius freely explains the details of its software architecture and scalability solutions to those same users, it is especially important for Broker Genius to demonstrate that it took "reasonable measures to protect [their] secrecy." *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985) (citations omitted). Based on the evidence adduced to date, Broker Genius has failed to do so and is therefore not entitled to the protection of trade secret law.

It is clear that Broker Genius has taken some care to limit the public exposure of its purported trade secrets. The user interface of AutoPricer v.3 is not advertised on the company's current website or in publicly available demonstration videos. And users can only access the software with passwords that they must keep confidential. In addition, the company does ensure that its employees sign both non-disclosure agreements and employee handbooks that broadly identify the company's "technology and products" as proprietary and/or confidential information. (PX-53 at 9.) Moreover, the individual disclosures highlighted by defendants during the preliminary injunction hearing – Broker Genius's '918 Patent Application, its publication of screenshots of a predecessor software, and the brief demonstrations to customers – did *not* necessarily extinguish Broker Genius's property rights in its trade secrets. Nevertheless, because Broker Genius regularly disclosed its alleged secrets to each of its customers without notifying them of the information's confidential nature or binding them to confidentiality agreements, Broker Genius is unlikely to be able to show that it undertook reasonable measures to protect the secrecy of its alleged trade secrets.

It is axiomatic that a plaintiff cannot recover for the misappropriation of a trade secret if he revealed that secret in a published patent or patent application. *Laurie Visual Etudes, Inc. v. Chesebrough-Pond's Inc.*, 83 A.D.2d 505, 505-06 (1st Dep't 1981); *see also BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 707 (7th Cir. 2006); *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 269 (S.D.N.Y. 2014); 2-8 Roger M. Milgrim, Milgrim on Trade Secrets § 8.02[2] (2017). However, a plaintiff can still have "a viable trade secret claim" if "elements of the trade secret go beyond what was disclosed" in the patent application. *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1195 (S.D. Cal. 2012); *see also Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 875 (5th Cir. 2013).[15]

Although there is no question that the '918 Patent Application describes in some detail the way in which AutoPricer v.3 functions (*see* DX-1 ¶¶ 53-56), it does not disclose each of the claimed secrets or the unique combination of features that comprise the software. The figures attached to the '918 Patent Application do not reveal the way in which the AutoPricer software actually appears to its users and the descriptions in the application are too imprecise to enable a developer to build a user experience and interface that shares as many features of AutoPricer as are found in defendants' TickPricer product.

---

[15] Broker Genius erroneously suggests that the publication of a patent only extinguishes a trade secret if the alleged misappropriators actually relied upon that disclosure. The foundation of this argument is a 1953 decision by the United States Court of Appeals for the Second Circuit, which states: "It matters not that defendants could have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. The fact is that they did not. Instead, they gained it from plaintiffs via their confidential relationship." *Franke v. Wiltschek*, 209 F.2d 493, 495 (2d Cir. 1953). *Franke* does not contradict federal and New York law on the overriding importance of a plaintiff's efforts to preserve the secrecy of its trade secret. In *Franke*, the patent at issue was *not* held by the plaintiffs. Nor did it reveal the entirety of the plaintiffs' alleged trade secret; the missing elements had to be ascertained by reverse-engineering the plaintiffs' product. *See Franke*, 209 F.2d at 500 (Frank, *J.*, concurring in part and dissenting in part). Thus, *Franke* simply supports the uncontroversial proposition that "it is no defense in an action [for misappropriation of trade secrets] that the process in question *could have* been developed independently, without resort to information gleaned from the confidential relationship." *Imperial Chem. Indus. Ltd. v. Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 743 (2d Cir. 1965) (citing *Tabor v. Hoffman*, 188 N.Y. 30, 35 (1889)).

(*See* Tr. at 165:7-18, 223:6-14.)  *See Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*, 5 Misc. 3d 285, 298 (N.Y. Cty. 2004) (granting preliminary injunction where plaintiff's patent "consist[ed] solely of six line drawings" and did not disclose "the precise dimensions, specifications, or other proprietary information with respect to the actual final design and manufacture" of the product at issue).

Similarly, Broker Genius's publication of screenshots of Price Genius – a predecessor software product with nearly identical functionality to AutoPricer v.3 (Tr. 62:3-63:5) – did not fully disclose its architecture, scalability solutions, or even the entirety of its UX/UI.  Although these screenshots obviously exposed particular aspects of the user interface, they did not reveal the various ways in which the widgets of a complex software program such as AutoPricer v.3 interact with one another.  (*See* Tr. 103:3-103:25, 105:9-15, *see also, e.g.*, Tr. 132:23-133:6, 155:13-19.)  Nor did they reveal the entirety of the software's architecture or Broker Genius's solution to the scalability problem.  *See Integrated Cash Mgmt. Servs., Inc. v. Dig. Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) ("The defendants have not shown that the limited information available in the promotional literature contains sufficient technical detail to constitute disclosure of the product's architecture."); *A.H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 16 (2d Cir. 1968).

Finally, Broker Genius did not disclose the entirety of its trade secrets in product demonstrations to potential customers despite the fact that Broker Genius representatives never required members of their audience to assent to the Terms of Use or sign any non-disclosure or confidentiality agreements. (Tr. 84:6-19, 85:7-11, 86:1-5.)  The Court credits the testimony of Broker Genius's Vice President of Sales, Zachary Ellman, who explained that these demonstrations were only three- to eight-minutes long and could not have revealed the full extent of Broker Genius's trade secrets.[16]  (Tr. 44:3-18.)  After

---

[16] Defendants dispute Ellman's characterizations of these demonstrations as brief high-level overviews; two of their witnesses, Ramin Malekian and Michael Shamah, testified that the first product demonstrations that they received from Ellman featured extensive discussions of the features and functionalities of Broker Genius's software.  (*See* Tr. 261:10-263:20 (Malekian); Tr. 488:21-490:4 (Shamah)).  However, the evidence showed that both witnesses would have received these more thorough demonstrations only after

all, the entire purpose of the demonstrations was to entice and encourage viewers to sign up for a thirty-day trial, in which they would receive the training necessary to fully understand and use the software.  (Tr. 39:12-20.)  To protect information as a trade secret, there only needs to be "so much [secrecy] that 'except by the use of improper means, there would be difficulty in acquiring the information.'"  *A.H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 16 (2d Cir. 1968), *cert. denied*, 393 U.S. 835 (1968) (quoting Restatement of Torts § 757, cmt. b).

There is no question that it would be exceedingly difficult for an audience member accustomed to manually pricing individual tickets to understand the complexity of the AutoPricer v.3 software and its various features from a demonstration that lasts only a few minutes.  (*See* Tr. 227:10-16.)  *Cf. A.H. Emery*, 389 F.2d at 16 ("Even though parts drawings may on occasion have been shown to a limited number of outsiders for a particular purpose, this did not in itself necessarily destroy the secrecy which protected them before they were so disclosed.").

It does bear noting, however, that although none of the aforementioned disclosures extinguished Broker Genius's property rights to its claimed trade secrets, these types of disclosures – especially taken together – *do* strongly suggest that Broker Genius did not consider AutoPricer v.3's software architecture or user interface to be trade secrets prior to initiating this litigation.  The fact that Broker Genius applied for a patent on its automatic ticket pricing technology indicates that it deliberately elected to use patent law, as opposed to the law of trade secrets, to protect its property rights in the architecture of its software.  *See* 2-9 Roger M. Milgrim, Milgrim on Trade Secrets § 8.02[1] (2017) (inventors must generally choose between the alternatives of pursuing patent protection for an invention and maintaining it as a trade secret).  Similarly, the fact that Broker Genius's sales representatives demonstrated to potential customers any AutoPricer features that were relevant for the brokers' businesses and never followed a specific

---

they – or an agent of their companies – had already signed up for accounts with Broker Genius and thereby accepted the Terms of Use.  (Tr. 261:3-4, 268:3-270:8; Broker Genius Client Account Creation Dates, PX-92 at 12 (Malekian); Tr. 531:16-533:21; Broker Genius Client Account Creation Dates, PX-92 at 9 (Shamah).)

script that would have kept certain topics off-limits (Tr. 65:7-9, 70:7-18, 72:15-24, 80:12-13), suggests that Broker Genius's representatives did not treat any particular user-facing element of the software as confidential.  *Cf. Invesco Institutional (N.A.), Inc. v. Deutsche Inv. Mgmt. Americas, Inc.*, Index No. 650154/07, 2009 WL 6442871, at *9-*10 (N.Y. Cty. 29, 2009).

The one disclosure that *did* destroy Broker Genius's claim that its software architecture, UX/UI, and scalability solutions are trade secrets is the unfettered access to this information that Broker Genius grants to each of its customers.  Every user of Broker Genius's software is given access to the software itself, as well as extensive training sessions, user manuals, explanatory videos, and feature update emails that explain how the software works and how to take advantage of each of its functionalities.  In addition, Broker Genius's customer support staff provide answers to user questions about operations such as the "cycle" speeds that are the focus of Broker Genius's scalability architecture trade secret and which may not otherwise be apparent to the users.  (*See* Email from Broker Genius to NRZ, Nov. 18, 2016, PX-26; *see also* Email from Abe Harary to Zalta, Feb. 23, 2017, Defs.' Post-Hearing Mem., Ex. A (forwarding "Feature Update" sent by Broker Genius to its customers, notifying them of AutoPricer's "pricing cycle frequencies" and explaining that Broker Genius "prioritize[s] pricing cycles by event and onsale date" to "keep things running smoothly").)  Indeed, the breadth of Broker Genius's disclosures explains why defendants were able to duplicate major portions of AutoPricer v.3's user interface, software architecture, and scalability solutions with such speed and for relatively little cost, all despite the lack of any evidence that defendants obtained access to AutoPricer v.3 that was different in kind from that which Broker Genius granted to its other customers.[17]

Although Broker Genius gives each of its users access to its purported trade secrets, it does not make oral representations to its users that its software or any of its components are confidential during trainings or

_____

[17] While Zachary Ellman testified that the training defendants received on AutoPricer v.3 was "on the excessive end" of what was normal for Broker Genius clients, he also acknowledged that other customers who regularly used the software were trained for similar periods of time.  (Tr. 36:15-22.)

explanatory videos.  Nor does it mark its training materials, emails about the software's functionalities, or the software itself with confidentiality legends.[18] Accordingly, Broker Genius's *only* means of notifying its users that the software they are using contains trade secrets is the Terms of Use and the Service Agreement.  Because the Terms of Use is the only licensing agreement that is in place when Broker Genius discloses its purported trade secrets to most AutoPricer v.3 users, the Court focuses its discussion on this document.

The Terms of Use are contained within a clickwrap agreement, which requires users to expressly assent and makes its contents viewable following a hyperlink.  As such, the agreement is enforceable so long as it provides "reasonably conspicuous notice of the existence of contract terms" and requires an "unambiguous manifestation of assent to those terms."  *Meyer v. Uber Techs., Inc.*, ___F.3d___, 2017 WL 3526682, at *5 (2d Cir. Aug. 17, 2017) (alterations omitted) (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002)).  Based on Dr. Koskinen's demonstration of the sign-up process for a Broker Genius account (Tr. 122:6-13), the Court concludes that the hyperlink to the Terms of Use was "reasonably conspicuous" and that users are required to provide an "unambiguous" "manifestation of assent" by clicking on a box next to the words:  "I agree."  *See Meyer*, 2017 WL 3526682, at *7-*9; *see also Moore v. Microsoft Corp.*, 293 A.D.2d 587, 587 (2d Dep't 2002).

But while a clickwrap agreement such as the Terms of Use is an enforceable contract, if Broker Genius had wanted to ensure that its users understood the highly counterintuitive notion that its trade secrets encompassed information that was readily discernable by – or freely disclosed to – each and every user, it would have been reasonable to do something more to notify users of the software's confidentiality.  *See*

---

[18] Oral identifications and confidentiality legends on individual documents are potent indicators of reasonable efforts to maintain secrecy, but they are neither sufficient nor necessary for trade secret protection.  *See Warehouse Sols. v. Integrated Logistics, LLC*, Civil Action No. 1:11-CV-02061, 2014 WL 12647878, at *7 (N.D. Ga. July 7, 2014) (verbal instruction that software was "confidential" and "proprietary" was insufficient to protect its trade secret status where defendants were never required to sign a confidentiality agreement); *Anacomp, Inc. v. Shell Knob Servs., Inc.*, No. 93 Civ. 4003, 1994 WL 9681, at *2, *9-*10 (S.D.N.Y. Jan. 10, 1994).

*Warehouse Sols., Inc. v. Integrated Logistics, LLC*, 1:11-CV-02061, 2014 WL 12647878, at *7 (N.D. Ga. July 7, 2014) (plaintiff's efforts to maintain secrecy were insufficient "in light of the self-revealing nature of the alleged trade secret"), *aff'd*, 610 F. App'x 881 (11th Cir. 2015); *cf. A.H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 16-17 (2d Cir. 1968) (requirements for protecting secrecy of "detailed manufacturing drawings" when disclosing them to experienced employees did not need to be stringent because the drawings' confidentiality would have been apparent to the employees).

Even if it were reasonable to rely exclusively on a clickwrap agreement to protect user-facing trade secrets, Broker Genius could at least have reminded users of the Terms of Use each time they accessed the AutoPricer v.3 software. *Cf. Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, No. 08-cv-5463, 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011) (describing software that required users to acknowledge the terms of use, which included a confidentiality clause, "*each time* the user attempts to launch the software") (emphasis added). In fact, Broker Genius does not even make the Terms of Use accessible through the AutoPricer v.3 application itself; users must go to Broker Genius's website for a reminder of the existence of the Terms of Use and for the opportunity to actually review their contents. (Tr. 464:3-6, 467:1-8.) Moreover, Broker Genius licenses its software to its customers on a per-company basis. Because these customers include companies with as many as 120 employees (Tr. 202:11-13), only the person who initially sets up the corporate account on behalf of her organization is required to assent to the Terms of Use (Tr. 471:6-13); other employees who may be more involved in everyday use of the software would not have the opportunity to individually assent and would not know what the Terms of Use were unless they were to proactively look for them in Broker Genius's website.

Regardless of whether a clickwrap license that is acknowledged only by a single individual at the time of creating a corporate account is in fact a reasonable way to protect the secrecy of AutoPricer v.3's architecture, UX/UI, and scalability solutions, it is clear that Broker Genius's Terms of Use agreement is not suitable for that task because it simply does not contain a confidentiality provision. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("[I]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information . . . , his

property right is extinguished."); *Fabkom, Inc. v. R.W. Smith & Assocs., Inc.*, No. 95 Civ. 4552, 1996 WL 531873, at *7 (S.D.N.Y. Sept. 19, 1996) ("Distribution to clients of a computer program through a *licensing agreement requiring confidentiality* does not destroy secrecy of a trade secret, but rather reinforces it.") (emphasis added); *see also Nova Chems., Inc. v. Sekisui Plastics Co., Ltd.*, 579 F.3d 319, 327-28 (3d Cir. 2009) (information disclosed to defendant distributor pursuant to a license "lost its trade secret status" because the license did not require defendant to "maintain the secrecy of any information it had acquired from [plaintiff]"); *Structured Capital Sols., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 832 (S.D.N.Y. 2016) (granting summary judgment to defendant on trade secret misappropriation claim because the agreement that plaintiff characterized as a confidentiality agreement did not actually place defendant "under an obligation to maintain [the] confidentiality" of plaintiff's alleged trade secrets).

Broker Genius contends that the Terms of Use provision providing that users of AutoPricer v.3 may not "[r]eproduce, modify, display, publicly perform, distribute or create derivative works of the Site or Apps or the Content" is in fact a "provision providing for confidentiality." (Pl.'s Post-Hearing Mem. 19 (quoting Terms of Use, updated June 12, 2014, PX-56 at 4).) However, plaintiff offers no support whatsoever for its conclusory interpretation. While the user restrictions of the Terms of Use do expressly bar users from *showing* others the AutoPricer v.3 user interface – including, one would infer, through a series of screenshots – they do not amount to a confidentiality or non-disclosure clause that notifies users of the secrecy of any aspect of AutoPricer v.3 or precludes them from describing to others the software's functions, structure, and appearance.

In fact, as defendants point out, this provision of the Terms of Use "essentially tracks the language of the Copyright Act [of 1976]" (Defs.' Post-Hearing Mem. 7), in which the same words – "reproduce," "display," "perform . . . publicly," "distribute," and "prepare derivative works" – are used to merely describe the exclusive rights of a copyright owner, *not* to ascribe confidentiality to a copyrighted work. 17 U.S.C. § 106. There is a difference between restrictions on the reproduction or the display of a work, such as the provision in the Terms of Use, and restrictions on disclosure – "trade secrets require a status of secrecy not required for copyright." 1

Nimmer on Copyright § 1.01[B][1][h] (2017).  This is not a trivial difference; it is essential to the unanimous conclusion that federal copyright law does not preempt state law regarding misappropriation of trade secrets.  *See id.*; *see also Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 717 (2d Cir. 1992) (noting that Congress drafted the Copyright Act of 1976 with an understanding that trade secret claims "contain elements, such as . . . breach of trust or confidentiality, that are different in kind from copyright infringement" (quoting H.R. Rep. No. 1476, 94th Cong. 54, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5748)).

A comparison of the restrictions found in the Terms of Use with those in licensing agreements that *did* protect trade secrets lays bare the inadequacy of the Terms of Use's purported confidentiality provision.  Unlike the Terms of Use, the other agreements all contain express references to duties of non-disclosure or confidentiality.  For instance, in *Fabkom* – a case upon which Broker Genius relies heavily – the court granted a preliminary injunction to a plaintiff software developer that had licensed its software through agreements which not only prohibited customers from "demonstrat[ing]" and "duplicat[ing]" the software, but also expressly required the customers to "agree[ ] and warrant[ ] to keep such materials confidential" and "not [to] authorize disclosure" by any of their employees or agents.  1996 WL 531873, at *2-3.

Similarly, in *Computer Associates International, Inc. v. Bryan*, 784 F. Supp. 982, 1000 (E.D.N.Y. 1992), the court granted a preliminary injunction to a software developer after finding that it had taken "assiduous and appropriate measures" to protect the confidentiality of its software architecture.  The court noted that the plaintiff's software licensing agreements contained a section entitled "confidential quality and restrictions," which required the "[l]icensee and its employees [to] keep the licensed program strictly confidential" and not to "disclose or otherwise distribute" it to "anyone other tha[n] the licensee's authorized employees."  *Id.* at 999.[19]  There are no comparable provisions in the Terms of Use.

---

[19] *See also LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 515 (S.D.N.Y. 2015) (finding that plaintiff software developer adequately pled claim for trade secret misappropriation against a former co-marketer where plaintiff licensed its software to

In this regard, the Terms of Use differ substantially from plaintiff's Service Agreement – the contract that is signed by those Broker Genius users such as NRZ that agree to longer-term licenses. The Service Agreement specifically includes a provision that references secrecy: the section entitled "No Right to Source Code" provides that the user "acknowledge[s] that the source code and underlying structure and algorithms of the Software are the property and proprietary trade secrets of BROKER GENIUS or its licensors" and further prevents users from "distribut[ing]" and "disseminat[ing]" the "Software." (Service Agreement, PX-8 § 6.4.) Notably, this provision implies that Broker Genius considered only underlying elements of AutoPricer v.3 to be its trade secrets.

Because the information that Broker Genius alleges defendants to have misappropriated cannot qualify as trade secrets, Broker Genius has failed to demonstrate that it is likely to succeed on the merits of its trade secrets misappropriation claims.

## V. SUFFICIENTLY SERIOUS QUESTIONS GOING TO THE MERITS AND BALANCE OF THE HARDSHIPS TIPPING TOWARD MOVANT

In the Second Circuit, a movant who cannot show a likelihood of success on the merits of their claims may alternatively receive an injunction upon a showing that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation," and that the "balance of hardships

---

both its clients and the defendant through agreements that "included confidentiality provisions"); *Mobius Med. Sys., LP v. Sun Nuclear Corp.*, No. 4:13-CV-3182, 2013 WL 6498981, at *13 (S.D. Tex. Dec. 10, 2013) (granting preliminary injunction to plaintiff software developer where defendant distributor and licensee end users were bound by confidentiality provisions in both the Distribution Agreement and the End User License Agreements); *i-Systems, Inc. v. Softwares, Inc.*, No. Civ. 02-1951, 2004 WL 742082, at *2 (D. Minn. Mar. 29, 2004) (denying defendant software distributor's motion for summary judgment on trade secret claim where plaintiff software developer's click-through software licenses with its end users provided that they could not "disclose any confidential information related to the software"); *Monovis, Inc. v. Aquino*, 905 F. Supp. 1205, 1228 (W.D.N.Y. 1994) (granting permanent injunction to plaintiff that licensed its single-screw compressor technology through an agreement requiring licensees "not [to] disclose to third parties" the tolerances or dimensions of plaintiff's screws).

tip[s] decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). The United States Court of Appeals for the Second Circuit has explained that this alternative approach empowers district courts to grant injunctions even in situations where they "cannot determine with certainty" at the preliminary injunction phase that the moving party is "more likely than not to prevail on the merits." *Id.; see also Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 443-44 (2d Cir. 1977).

In the case *sub judice*, Broker Genius cannot establish serious questions going to the merits of its trade secret misappropriation claims for the same reasons that it is not likely to succeed in proving those claims at trial. Discovery on Broker Genius's trade secrets claim has already revealed that Broker Genius divulges the same information that it alleges to have been misappropriated by defendants to each of its users as a matter of course and that it does so pursuant to a Terms of Use agreement that does not provide for the confidentiality of that information.

Because plaintiff's widespread and comprehensive disclosures extinguished the trade secret status of the information that Broker Genius claims was misappropriated by defendants, there is neither a likelihood of success nor a "sufficiently serious question" going to the merits of Broker Genius's trade secret misappropriation claims. As a result, the Court declines to issue an injunction in this case. *See Gen. Patent Corp. v. Wi-Lan Inc.*, No. 11 Civ. 6585, 2011 WL 5865194, at *5 (S.D.N.Y. Nov. 22, 2011); *see also DS Parent, Inc. v. Teich*, No. 5:13-CV-1489, 2014 WL 546358, at *12 (N.D.N.Y. Feb. 10, 2014).

## VI. CONCLUSION

Plaintiff elected to seek an injunction only with respect to its claims of trade secret misappropriation. But the law of trade secrets is not so flexible as to allow elements of a software program that are necessarily disclosed to all of its users – without accompanying confidentiality obligations – to be

classified as protectable trade secrets. Accordingly, the Court denies plaintiff's motion for a preliminary injunction.

Dated: New York, New York

December 4, 2017

SO ORDERED:

Sidney H. Stein, U.S.D.J.